**UNITED STATES of America**

v.

**Paul T. POTTER.**

**No. Crim. 99–280–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 24, 1999.

Thomas H. McQuillan, U.S. Attorney's Office, Alexandria, VA, Mark Tellitocci, U.S. Attorney's Office, Alexandria, VA, for plaintiff.

Cary Steven Greenberg, Fairfax, VA, for defendant.

### MEMORANDUM OPINION

ELLIS, District Judge.

This is a prosecution of an asbestos removal contractor on two charges: (i) improper disposal of regulated asbestos-containing material, in violation of 42 U.S.C. § 7413(c)(1), and (ii) failure to notify the United States Environmental Protection Agency of an asbestos removal project, in violation of 42 U.S.C. § 7413(c)(2), all in violation of the Clean Air Act, 42 U.S.C.

§ 7401 *et seq.* At issue on a pretrial motion to suppress are two issues: (i) whether defendant's expectation of privacy in a rented trailer searched by government agents was objectively reasonable, and (ii) whether the government agents reasonably believed that they had consent to search the trailer.

### I.

The facts relevant to disposition of the instant motion are largely uncontested. Defendant, Paul T. Potter, is the Vice-President of an asbestos-removal company, Chelsea Environmental Corporation (CEC). In April 1996, defendant, on behalf of CEC, contracted with the Fairfax County Public Schools (FCPS) to remove asbestos-containing floor tiles from three Fairfax County elementary schools. Thereafter, in June 1996, defendant rented a forty-five foot enclosed box trailer from Summit Transport Groups, Incorporated (Summit), for use in connection with the FCPS asbestos removal project. Pursuant to this rental agreement, Summit was responsible for moving the trailer from one location to another and defendant was not to be billed until Summit received a manifest indicating that all hazardous materials placed in the trailer had been disposed of at a certified landfill site.

CEC began performance on the project on June 25, 1996. Asbestos-containing floor tiles removed from each school were placed in trash bags and loaded onto the trailer. Because the asbestos-containing materials from the FCPS project did not fill the trailer, defendant, on August 22, 1996, called American Trailer Sales Company (ATS) to inquire about renting a parking space to store the trailer on a month-to-month basis. An ATS employee informed defendant that a parking space was available at ATS's storage lot in Lorton, Virginia for $55 per month. Defendant agreed to this rate, rented the space and provided ATS with certain information, including his business address and

telephone number, and his personal telephone and pager numbers. A few days later, on August 27, 1996, the trailer was moved to ATS's Lorton lot, at which time it was padlocked and left for storage. Defendant retained the only key to the padlock.

ATS began billing defendant on a monthly basis in September 1996. Monthly invoices were sent to defendant automatically at CEC's business address. Despite receiving this invoices, defendant made no rental payments to ATS during the months of September 1996 through December 1996. This prompted Linda Lee, ATS's Operations Manager, to contact defendant on numerous occasions regarding his overdue account. On one of these occasions, Lee informed defendant that if he did not pay his overdue account, ATS would remove defendant's trailer from the Lorton lot and place it on the side of the road. Faced with this ultimatum, defendant, in January 1997, paid ATS in full for the months of September through December.

For the next year, from January 1997 to December 1997, ATS continued to send monthly invoices to defendant at CEC's business address. Again, defendant received these invoices, but made no further rental payments to ATS. During this period, Lee, on several occasions, attempted unsuccessfully to contact defendant regarding his overdue account, discovering instead that defendant's business telephone and pager numbers had been disconnected.[1] Beyond this measures, ATS made no further attempts to contact defendant.

In October 1997, after nearly ten months of non-payment, William Brown, ATS's Lorton site Division Manager, observed defendant supervising several other individuals, clothed in protective gear and dust masks, loading trash bags into the trailer. Brown approached the group and asked defendant whether the trailer be-

---

1. Defendant testified that his published home telephone number remained in service.

longed to him and defendant replied that it did. Defendant further informed Brown that he was supervising the placement of asbestos-containing materials into the trailer.

Following this incident, Brown contacted ATS owner Buzz Hurley and reported to Hurley the sum and substance of his conversation with defendant, including the fact that hazardous materials were being stored in the trailer. Hearing this, Hurley became concerned and contacted Waste Management, a waste disposal company. Waste Management representatives subsequently visited the Lorton lot on two occasions. On the first occasion, Brown escorted the Waste Management representative to the trailer and removed defendant's padlock with bolt cutters to allow the representative to enter the trailer for observation. On the second occasion, the Waste Management representative simply entered the unlocked trailer and observed its contents. Both representatives confirmed the presence of asbestos-containing materials in the trailer and, following both inspections, Brown left the trailer doors closed, but unlocked. The trailer unlocked until late December 1997. Defendant, however, was unaware that his padlock had been removed, as he never again checked on the trailer following his October 1997 visit to the Lorton lot.

In December 1997, Hurley became increasingly concerned about defendant's trailer because ATS's lease on the Lorton lot was due to expire at the end of the year. Hurley knew from Lee that defendant had not paid his rental account for 12 months and that his phone numbers had been disconnected. Faced with these circumstances, Hurley contacted the Fairfax Fire and Rescue Department (FFRD) and informed one of its investigators that there was an abandoned trailer parked at the Lorton lot that he believed contained hazardous materials. Hurley further informed the investigator that the trailer needed to be removed from the lot by December 31, 1997, and that all attempts to contact defendant had been unsuccessful.

Following Hurley's call, Captain David McKernan from FFRD contacted several state and federal agencies, including the Federal Bureau of Investigation (FBI), the Environmental Protection Agency (EPA), the Virginia Department of Environmental Quality (DEQ) and the Virginia Department of Labor and Industry (DOLI). On December 23, 1997, Captain McKernan arrived at the Lorton site with FBI agent Robert Warner, DEQ Waste Compliance Manager John Neely and DOLI Occupational Compliance Health Officer Sandra Watford. They were met there by Brown, who confirmed to them that defendant had rented a parking space to store the trailer in August 1996 and that he had made rental payments to ATS for 12 months. Brown did not, however, tell the agents about defendant's October 1997 visit to the trailer. Nor, it appears, did he tell the agents that, until October 1997, the trailer had been padlocked by defendant. Brown then escorted the agents to the trailer, the doors of which were closed but not locked.

Government agents opened the doors and conducted a visual inspection of the trailer's contents, observing numerous black plastic trash bags marked "asbestos," some of which were split open with floor tiles protruding through the openings. The agents also observed a roll of labels marked "Rolling Valley Elementary School." Following the search, the trailer was locked with two padlocks furnished by government agents and the back of the trailer was marked with Fairfax County Fire Investigation evidence tape. One set of keys to the padlocks was given to the FBI and one set was retained by Captain McKernan.

Over the next month, government agents visited the Lorton lot periodically to ensure that the trailer remained locked and undisturbed. Thereafter, on January 20, 1998, FBI agent Marvin Strickland contacted Summit's owner, Thomas Gaudet, from whom he learned that defendant

had rented the trailer from Summit in June 1996 and that defendant had not paid any rent on the trailer as of January 1998.[2] Strickland further learned that Gaudet had not spoken to defendant about the status of the trailer since defendant's telephone number had been disconnected. At the conclusion of their conversation, Strickland asked Gaudet for permission to search the trailer and take samples of the trailer's contents and Gaudet consented.

Based on Gaudet's consent, government agents on January 21, 1998, returned to the Lorton lot and searched the trailer. Present at this second search were Captain McKernan, FBI agents Warner and Strickland, EPA Special Agent Douglas Parker, and several EPA laboratory technicians. Once the trailer was opened, EPA technicians took samples and photographs of the trailer's contents and, following the search, the trailer was again locked by government agents.

Once it was established that the samples taken from the trailer indeed contained asbestos, arrangements were made by government agents and the FCPS to dispose of the contents of the trailer. To this end, the trailer, with the aid of a county tractor, was moved on February 27, 1998, to the Fairfax County Landfill in Lorton, Virginia. Less than a week later, on March 2, Captain McKernan unlocked the trailer so that WACO, the local disposal company hired by FCPS, could set up their disposal equipment. On March 3, before WACO began the disposal process, EPA technicians removed additional samples from the trailer. Shortly thereafter, the trailer's contents were properly buried in the landfill.

Defendant was later charged in a two-count Indictment with improper disposal of regulated asbestos-containing material, in violation of 42 U.S.C. § 7413(c)(1), and fail-

ure to notify the EPA of an asbestos removal project, in violation of 42 U.S.C. § 7413(c)(2). The government indicated its intention to offer into evidence at defendant's trial some of the samples taken from the trailer. Defendant opposed the government's offer of these samples, arguing that the warrantless searches conducted by government agents on December 23, 1997, January 21, 1998 and March 3, 1998, violated the Fourth Amendment to the United States Constitution and, therefore, that all evidence seized during the course of those searches must be suppressed. For the reasons that follow, defendant's motion to suppress fails.

## II.

A defendant claiming to have been · subjected to an unlawful search in violation of the Fourth Amendment must establish, as a threshold matter, that he had a legitimate expectation of privacy in the particular area searched. *See Rakas v. Illinois,* 439 U.S. 128, 148–49, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). A legitimate expectation of privacy depends on two factors: (i) whether defendant manifested a subjective expectation of privacy in the area searched, and (ii) whether defendant's subjective expectation of privacy was objectively reasonable. *See California v. Greenwood,* 486 U.S. 35, 39, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988). The burden of establishing a legitimate expectation of privacy in this regard rests on the defendant. *See Rakas,* 439 U.S. at 134, 99 S.Ct. 421.

Because the Fourth Amendment focuses on privacy interests, not property interests, the limits of Fourth Amendment protection are not defined by traditional concepts of property law. Put another way, the capacity to claim Fourth Amendment protection "depends not upon a property right in the invaded place,"[3] but on

---

**2.** The record is unclear whether Gaudet also disclosed to Strickland that no bills had been sent to defendant, as Summit's normal course of business was to bill the customer only after it received a manifest indicating that all hazardous materials placed in the trailer had

been disposed of at a certified landfill site. This disposal, of course, never occurred.

**3.** *Bonner v. Anderson,* 81 F.3d 472, 475 (4th Cir.1996) (citing *Rakas v. Illinois,* 439 U.S. at 143, 99 S.Ct. 421).

whether the individual had a legitimate expectation of privacy in that place. *See Greenwood,* 486 U.S. at 39, 108 S.Ct. 1625. Thus, the focus of the Fourth Amendment inquiry is not on whether an individual has a property interest in the area searched, or whether the individual "had abandoned his interest in the property-law sense" at the time a search was conducted.[4] Rather, the proper inquiry is whether an individual can demonstrate that he or she had a subjective expectation of privacy in the area searched that was objectively reasonable. *See Greenwood,* 486 U.S. at 39, 108 S.Ct. 1625.

■ To satisfy the subjective inquiry, a defendant need only have exhibited an expectation of privacy. *See id.* In other words, a defendant, through his or her own conduct, must have demonstrated an intention to keep his or her activities and items private, and must not have knowingly exposed them to the open view of the public. *See Katz v. United States,* 389 U.S. 347, 351–52, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). This test, applied here, compels the conclusion that defendant had a subjective expectation of privacy in the trailer at the time it was searched by government agents. In this regard, defendant did not give anyone from ATS, Summit or any local, state or federal authorities permission, either verbally or in writing, to enter the trailer while it was parked at the Lorton lot. Also, the trailer had no windows; its contents were not open to public view. Moreover, defendant padlocked the trailer when it was moved to the Lorton lot and thereafter kept the key in his sole possession. Under these circumstances, it is evident that defendant believed that he was the only person with access to the trailer while it was parked in the Lorton lot. Thus, his subjective expectation of privacy in the trailer at the time of the searches has been established.

But this does not end the analysis, as defendant, to establish a "legitimate expectation of privacy" under the Fourth Amendment, must also demonstrate that his subjective expectation of privacy in the trailer was objectively reasonable. *See Greenwood,* 486 U.S. at 39, 108 S.Ct. 1625. To satisfy this test, defendant's expectation must have been "of a type that society would recognize as legitimate." *Minnesota v. Olson,* 495 U.S. 91, 95–97, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); *California v. Ciraolo,* 476 U.S. 207, 210, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (standing to challenge search requires a subjective expectation of privacy that society would recognize as legitimate). The question whether society would recognize an expectation of privacy as reasonable can be answered "by assessing the nature of a particular practice and the likely extent of its impact on the individual's sense of security balanced against the utility of the conduct as a technique of law enforcement." *United States v. White,* 401 U.S. 745, 786, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (J. Harlan, dissenting). Ultimately, the inquiry requires value judgment that turns on "our societal understanding" as to what is deserving of "protection from government intrusion." *Oliver v. United States,* 466 U.S. 170, 183, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). In this regard, "[n]o single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant." *Id.* at 177, 104 S.Ct. 1735.

■ These principles, applied here, make clear that defendant's subjective expectation of privacy in the trailer was not objectively reasonable. Several factors lead to this conclusion. First, despite his ongoing rental obligations, defendant failed to make any rental payments to ATS for

---

**4.** *California v. Rooney,* 483 U.S. 307, 320, 107 S.Ct. 2852, 97 L.Ed.2d 258 (1987) (J. White, dissenting) (recognizing that the question presented was not whether defendant "had abandoned his interest in the property-law sense" in a trash bag searched by government agents, but rather, whether defendant "retained a subjective expectation of privacy in the trash bag that society accepts as objectively reasonable.") (citations omitted).

over 12 months. Moreover, defendant was on notice that failure to fulfill his rental obligations in this manner could result in severe consequences. Indeed, Lee early on informed defendant that the trailer would be removed from the Lorton lot and placed on the side of the road in the event that rent was not paid. Next, defendant allowed months to pass between visits to the Lorton lot, thereby enabling others to exercise dominion and control over the trailer without defendant's awareness. In fact, defendant did not visit the Lorton lot once from late October 1997 to late February 1998, the months that ATS personnel and government agents were monitoring and examining the trailer and its contents. And, the fact that defendant's business telephone and pager numbers were disconnected at some point in 1997 only added to defendant's absence from the situation.

In light of these circumstances, and in light of the record as a whole, defendant could not have reasonably believed that the trailer would remain secure and free from government intrusion. To the contrary, by failing to pay rent to ATS and by failing to monitor the trailer and discover that his padlock had been removed, and knowing that ATS representatives were aware that the trailer contained hazardous materials, defendant created a situation where a reasonable person would expect or predict precisely what occurred here, namely, that ATS would become concerned over the presence of hazardous materials in the trailer and contact the authorities. To nourish and maintain an objectively reasonable expectation of privacy in this case, defendant was obligated to act with greater care toward the trailer and its contents. Because defendant did not do so, the government searches did not infringe upon any of "the personal and societal values protected by the Fourth Amendment." *Oliver*, 466 U.S. at 183, 104 S.Ct. 1735. To the contrary, the government searches were reasonable and effective law enforcement techniques that, in the circumstances, would not impair any reasonable citizen's sense of security or privacy

expectations. In simpler terms, defendant did not have a legitimate expectation of privacy in the trailer at the time it was searched. *See Rakas*, 439 U.S. at 148–49, 99 S.Ct. 421.

Although there is no circuit decision on precisely identical facts, analogous authority from other circuits supports this conclusion. *See, e.g., United States v. Poulsen*, 41 F.3d 1330 (9th Cir.1994) (defendant lacked legitimate expectation of privacy in rented storage locker where (i) his rent was overdue, and (ii) the manager of the storage facility took control over the locker's contents pursuant to the terms of the rental agreement); *United States v. Hoey*, 983 F.2d 890 (8th Cir.1993) (defendant lacked legitimate expectation of privacy in rented apartment where (i) she had not paid rent in over six weeks, and (ii) she had "left" the apartment); *United States v. Melucci*, 888 F.2d 200 (1st Cir.1989) (defendant lacked legitimate expectation of privacy in a rented storage unit where (i) he failed to pay rent for two months, (ii) the lessor tried unsuccessfully to contact defendant, and (iii) the lessor took possession of the unit by cutting off defendant's padlock and replacing it with his own).

### III.

Even assuming that defendant had a legitimate expectation of privacy in the trailer at the time it was searched, the searches would still be valid if the government agents had the "apparent authority" to conduct the searches. *See Illinois v. Rodriguez*, 497 U.S. 177, 188, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (adopting "apparent authority" doctrine). Indeed, it is a well-recognized principle in this circuit and elsewhere that evidence obtained by government agents acting under a reasonable belief that they had valid consent to conduct a search need not be suppressed. *See, e.g., United States v. Gutierrez–Hermosillo*, 142 F.3d 1225, 1229–30 (10th Cir.), *cert denied,* —— U.S. ——, 119 S.Ct. 230, 142 L.Ed.2d 189 (1998); *Forman v. Rich-*

*mond Police Department,* 104 F.3d 950, 958–59 (7th Cir.), *cert. denied,* 522 U.S. 997, 118 S.Ct. 563, 139 L.Ed.2d 403 (1997); *United States v. Kinney,* 953 F.2d 863, 866 (4th Cir.), *cert. denied,* 504 U.S. 989, 112 S.Ct. 2976, 119 L.Ed.2d 595 (1992); *United States v. Dunkley,* 911 F.2d 522, 526 n. 4 (11th Cir.1990), *cert. denied,* 498 U.S. 1052, 111 S.Ct. 765, 112 L.Ed.2d 785 (1991).

■ An objective standard is applied in determining whether a government agent had the "apparent authority" to conduct a search. Thus, the question to be asked is whether the facts available to a government agent at the moment of a search would "warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Rodriguez,* 497 U.S. at 188, 110 S.Ct. 2793. If so, then a warrantless search is valid. *See id.* at 189, 110 S.Ct. 2793. If not, however, a "warrantless entry without further inquiry is unlawful unless authority actually exists." *Id.* at 188–89, 110 S.Ct. 2793. Significantly, whether the basis for such authority exists "is the sort of recurring factual question to which law enforcement officials must be expected to apply their judgment; and all the Fourth Amendment requires is that they answer it reasonably." *Id.*

In practice, the "apparent authority" doctrine does not permit law enforcement officers to accept without question every invitation to conduct a search. Indeed, even when an invitation to search is accompanied by an explicit assertion that a person has authority over a particular area, "the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry."[5] This is not to say, however, that government officials must contest every claim of authority. If, for example, a landlord flatly asserts that his or her tenant has been evicted, and this assertion is rendered plausible by the surrounding circumstances, "it certainly is not necessary for the police to file a quiet title suit for the purpose of ascertaining whether the tenant still retains some possessory interest in the premises."[6]

■ The factual record here compels the conclusion that the government agents acted reasonably in believing that they had consent to search the trailer on all three occasions. The first search, conducted on December 23, 1997, was prompted by Hurley's call to the FFRD earlier that month, during which he reported that a trailer containing hazardous materials had been "abandoned" in the Lorton lot and that all attempts to contact defendant had been unsuccessful. Armed with this information, Captain McKernan from FFRD contacted state and federal authorities and an investigation ensued. The agents found the trailer unlocked on the date of the first search and, prior to conducting the search, they questioned Brown, who verified that defendant had not made rental payments to ATS in 12 months. All of these circumstances combined would clearly "warrant a man of reasonable caution" in the belief that ATS, acting through Hurley and Brown, had authority over the trailer at the time of the first search.[7] *Rodriguez,* 497 U.S. at 188, 110 S.Ct. 2793.

5. *Rodriguez,* 497 U.S. at 188, 110 S.Ct. 2793. *See also Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (police were not entitled to rely upon the consent of a hotel clerk when they knew that the hotel room was rented and exclusively occupied by the defendant, for they could not reasonably have believed that the hotel clerk had general access to or control over the room).

6. 3 Wayne R. LaFave, *Search and Seizure, A Treatise on the Fourth Amendment* § 8.3(g) (3d ed.1996). *See also United States v. Saa-*

*deh,* 61 F.3d 510 (7th Cir.) (woman had apparent authority to allow search of car repair shop, as she "clearly monitored the entry and exit of customers and employees" and informed agent "that she maintained control over the premises, including access into the building"), *cert. denied,* 516 U.S. 990, 116 S.Ct. 521, 133 L.Ed.2d 428 (1995).

7. Although Brown did not inform the agents in December 1997 that defendant had visited the Lorton lot in October 1997, or that the trailer had previously been padlocked by de-

Further, there is nothing in the record to show that the agents should have disbelieved or, indeed, even doubted, Brown and Hurley's assertions that the trailer had been abandoned by defendant. And, contrary to defendant's contentions, given the circumstances presented here, the government agents were not under any affirmative duty to investigate the matter further or to conduct an independent search for the defendant.

The circumstances surrounding the second and third government searches on January 21, 1998, and March 3, 1998, are even more persuasive, given that the government agents acted on the express consent of Gaudet, the actual owner the trailer. Before giving his consent, Gaudet informed agent Strickland that the trailer had been in defendant's possession for nearly one and one-half years, and that, like ATS, Gaudet had not heard from, or been able to contact, defendant regarding the status of the trailer since defendant's telephone number had been disconnected. Again, these circumstances would "warrant a man of reasonable caution" in the belief that Gaudet, as owner of the trailer, had the authority to consent to the second and third searches. *Rodriguez,* 497 U.S. at 188, 110 S.Ct. 2793.

The fact that the trailer, strictly speaking, may not have been abandoned under state property law principles is of no consequence to this analysis.[8] The facts presented to the agents supported the conclusion of abandonment and any mistakes on the part of the agents in acting based on Brown's, Hurley's and Gaudet's assertions were mistakes of fact, not law. These are exactly the types of mistakes that are permissible under the "apparent authority" doctrine. *See United States v. Whitfield,* 939 F.2d 1071, 1073 (D.C.Cir.1991) (*Rodriguez* apparent authority doctrine means

fendant these oversights were those of Brown, a private party, and not of any government agent.

that "the Fourth Amendment does not invalidate warrantless searches based on a reasonable mistake of fact, as distinguished from a mistake of law"); *United States v. Brazel,* 102 F.3d 1120, 1149 (11th Cir.1997) (where landlord told police officer that premises were vacant, any mistake of the police officer in concluding that the landlord had authority to consent to the search was "a mistake of fact, not one of law").

## IV.

In summary, defendant lacked a legitimate expectation of privacy in the trailer at the time it was searched by government agents. Moreover, the agents reasonably believed that they had consent to conduct the searches. In light of these conclusions, the government searches were reasonable and hence valid under the Fourth Amendment and defendant's motion to suppress must be denied.

An appropriate order issued on November 10, 1999.

8. Of course, there can be no legitimate expectation of privacy in property that has been abandoned under state law.