**UNITED STATES of America, Plaintiff,**

v.

**Terence W. COOPER, Frank D. Heck, and Paige A. Heck, Defendants.**

**No. 02–40069–01/02/03–SAC.**

United States District Court, D. Kansas.

Aug. 21, 2003.

Mark L. Bennett, Jr., Bennett & Hendrix, LLP, Topeka, KS, Terrence J. Campbell, Barber, Emerson, Springer, Zinn & Murray, LC, Lawrence, KS, Melody J. Evans, Office of Federal Public Defender, Stephen W. Kessler, Topeka, KS, for defendants.

Tanya J. Treadway, Office of United States Attorney, Topeka, KS, for plaintiff.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

The case comes before the court on the parties' numerous contested pretrial motions. The following motions filed by the government are pending:

Motion for Discovery (Dk.45), Motion to Allow Two Case Agents to be Excused From Rule 615 Sequestration (Dk.88), and Motion to Supplement (Dk.127). The defendants have filed the following joint motions that await decision: Motion in Limine (Dk.94), Motion to Dismiss Indictment (Dk.95), Motion to Determine Admissibility of Extra–Judicial Statements of Alleged Co–Conspirators (Dk.96), Motion for Discovery (Dk.99), Motion to Require Preservation of Investigative Officers' Handwritten Notes (Dk.101), Motion for Bill of Particulars (Dk.106), Motion to Strike Surplusage From the Indictment (Dk.107), Motion to Suppress (Dk.110), Motion for Recusal (Dk.130). In addition, the defendant Frank D. Heck has filed a motion for joinder (Dk.93), the defendant Paige A. Heck has given notice of her joinder in co-defendants' motions (Dks. 92 and 97), and the defendant Terence W. Cooper had filed a Motion for *Simmons* Immu-

nity (Dk.140). Because it goes to the propriety of even handling this case, the court will look first at the motion to recuse.

## DEFENDANTS' MOTION TO RECUSE (Dk.130)

The defendants jointly move the court for an order of recusal pursuant to 28 U.S.C. § 455 arguing that the court's impartiality in this case might reasonably be questioned as a result of its prior ruling on the government's motion to compel in the underlying grand jury proceedings. On May 2, 2001, in its assigned role of overseeing the grand jury proceedings, this court issued a memorandum granting in part and denying in part the government's motion to compel compliance with its subpoena duces tecum issued to Scott Long, who was represented to be a business partner of the defendants and an officer, shareholder or consultant to the entities under investigation. As summarized in that order, Mr. Long opposed the production of some documents claiming they were protected from discovery by either the attorney-client privilege or the work product doctrine, and the government argued first that the documents were not privileged and, alternatively, that the privilege had been waived by the abandonment of certain attorney-client communications. Without conducting any hearing, the court relied on declarations from Agent Brian Holt with HHS–OIG (Health and Human Services–Office of Inspector General) and the building owner, James Leon Coker, in concluding in that order: "The uncontroverted facts (solely for purposes of this motion) establish that in November of 1988(sic), Midwest Health Care Providers Inc. ('Midwest') locked the doors to the premises it had been leasing and abandoned the premises, leaving behind a cat, furniture, other items and numerous documents."

Acknowledging that courts do not recognize prior adverse rulings in a proceeding as sufficient grounds alone for recusal, the defendants emphasize that the adverse ruling here occurred prior to indictment and without the defendants' opportunity for input and that this ex parte ruling concerns the very same issue of abandonment now being raised in their motion to suppress. In opposing the motion, the government denies that the defendants' interests were not represented by counsel in the underlying grand jury proceeding and that the court issued an ex parte ruling in the grand jury proceeding. The government points to a memorandum filed in opposition to the motion to compel by counsel for Scott Long, Midwest Health Care Providers, Inc., Frank Heck, Paige Heck and Troy Heck.[1] The government does agree that the defendants' counsel in those proceedings did not dispute the government's factual allegations on the abandonment issue. Not only are adverse rulings insufficient grounds alone for recusal, but the government also argues that the defendants have not identified any extrajudicial source as grounds for impartiality and have not alleged any facts that would indicate the prior ruling is evidence of a deep-seated bias preventing the court from being fair.

The defendants rely on 28 U.S.C. § 455(a) which provides:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

---

**1.** At the hearing, the defendants Frank Heck and Paige Heck conceded they were represented by counsel in that proceeding.

■■■ "This statute seeks to balance two competing policy considerations: first, that courts must not only be, but seem to be, free of bias or prejudice, . . .; and second, the fear that recusal on demand would provide litigants with a veto against unwanted judges." *In re Boston's Children First,* 244 F.3d 164, 167 (1st Cir.2001) (internal quotation and citations omitted). Under § 455(a), "the obligation to identify the existence of [bias or prejudice] is upon the judge himself, rather than requiring recusal only in response to a party affidavit." *Liteky v. United States,* 510 U.S. 540, 548, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). A judge has a duty to recuse herself if she "concludes that sufficient factual grounds exist to cause an objective observer reasonably to question the judge's impartiality." *United States v. Cooley,* 1 F.3d 985, 992 (10th Cir.1993) (citation omitted). The decision to recuse remains within the sound discretion of the district court judge. *United States v. Stenzel,* 49 F.3d 658 (10th Cir.), *cert. denied,* 516 U.S. 840, 116 S.Ct. 123, 133 L.Ed.2d 73 (1995). However, "if the question of whether § 455(a) requires disqualification is a close one, the balance tips in favor of recusal." *Nichols v. Alley,* 71 F.3d 347, 352 (10th Cir.1995).

■■■ When a judge fails to remove himself sua sponte under § 455(a), a party may ask the judge to recuse himself pursuant to that section. *See, e.g., Liteky,* 510 U.S. at 542–43, 114 S.Ct. 1147; *Green v. Branson,* 108 F.3d 1296, 1305 (10th Cir. 1997). Section 455(a) motions for recusal "must be timely filed," which means a movant must act promptly upon learning the facts underlying the motion. *United States v. Pearson,* 203 F.3d 1243, 1276 (10th Cir.) (quoting *Willner v. University of Kansas,* 848 F.2d 1023, 1028 (10th Cir. 1988), *cert. denied,* 488 U.S. 1031, 109 S.Ct. 840, 102 L.Ed.2d 972 (1989)), *cert. denied,*

530 U.S. 1268, 120 S.Ct. 2734, 147 L.Ed.2d 995 (2000). On the other hand, litigants may assume the impartiality of the assigned judge rather than investigating a judge's private affairs and financial matters, for judges have an ethical duty to "disclose on the record information which the judge believes the parties or their lawyers might consider relevant to the question of disqualification." *American Textile Mfrs. Institute, Inc. v. The Limited, Inc.,* 190 F.3d 729, 742 (6th Cir.1999) (quotation omitted), *cert. denied,* 529 U.S. 1054, 120 S.Ct. 1556, 146 L.Ed.2d 461 (2000).

■■■ The important policy behind this statute is to promote "public confidence in the integrity of the judicial process." *Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 858 n. 7, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988). The Tenth Circuit recently summarized the law relevant in analyzing these provisions:

> The trial judge must recuse himself when there is the appearance of bias, regardless of whether there is actual bias. *Nichols v. Alley,* 71 F.3d 347, 350 (10th Cir.1995). "The test is whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality." *Hinman v. Rogers,* 831 F.2d 937, 939 (10th Cir.1987) (citation omitted). If the issue of whether § 455 requires disqualification is a close one, the judge must be recused. *Nichols,* 71 F.3d at 352.

> On the other hand, a judge also has "as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require." *Id.* at 351. The recusal statute should not be construed so broadly as to become presumptive or to require recusal based on unsubstantiated suggestions of personal bias or prejudice. *Switzer v. Berry,* 198 F.3d 1255, 1258 (10th Cir.

2000); *see also United States v. Cooley,* 1 F.3d 985, 993 (10th Cir.1993) ("The statute is not intended to give litigants a veto power over sitting judges, or a vehicle for obtaining a judge of their choice.").

*Bryce v. Episcopal Church in the Diocese of Colorado,* 289 F.3d 648, 659–660 (10th Cir.2002). It covers both "interest or relationship" grounds and "bias or prejudice" grounds. *Liteky v. United States,* 510 U.S. at 548, 114 S.Ct. 1147.

■ The inquiry under Section 455(a) "is limited to outward manifestations and reasonable inferences drawn therefrom." *United States v. Cooley,* 1 F.3d at 993. "[T]he appearance of impartiality is virtually as important as the fact of impartiality." *Webbe v. McGhie Land Title Co.,* 549 F.2d 1358, 1361 (10th Cir.1977). "The standard is purely objective. The inquiry is limited to outward manifestations and reasonable inferences drawn therefrom." *Estate of Bishop v. Equinox Intern. Corp.,* 256 F.3d 1050, 1058 (10th Cir.2001) (quotation and citation omitted), *cert. denied,* 534 U.S. 1130, 122 S.Ct. 1069, 151 L.Ed.2d 972 (2002). "Factors that do not merit disqualification include: rumor, speculation, beliefs, conclusions, or other non-factual matters." *Id.* (citation omitted). Put another way, "disqualification [is] appropriate only when the charge is supported by a factual basis, and when the facts asserted provide what an objective, knowledgeable member of the public would find to be a reasonable basis for doubting the judge's impartiality." *In re Boston's Children First,* 244 F.3d at 167 (internal quotation, footnote and citation omitted).

■ Intended to protect litigants from jurists who may be biased and prejudiced, the recusal statutes should not be used to protest court orders or to circumvent court procedures with which litigants disagree. Courts have recognized the manifest potential for these statutes to be misused. *Hall v. Doering,* 185 F.R.D. 639, 642–643 (D.Kan.1999). "The statute is not intended to give litigants a veto power over sitting judges, or a vehicle for obtaining a judge of their choice." *United States v. Cooley,* 1 F.3d at 993. Consequently, a judge "should not recuse himself on unsupported, irrational, or highly tenuous speculation." *Hinman,* 831 F.2d at 939 (citation omitted). "[T]he public importance or the public notoriety attached to a case has never been a considered a ground for recusal by this judge." *Tonkovich v. Kansas Bd. of Regents,* 924 F.Supp. 1084, 1087 (D.Kan.1996). For that matter, "[t]he mere fact, however, that a judge has general familiarity with the facts of a case does not require recusal." *Id.* at 1088 (citing *Cooley,* 1 F.3d at 993).

■ Prior adverse rulings alone do not constitute grounds for disqualification. *See Green v. Branson,* 108 F.3d at 1305; *United States v. Cooley,* 1 F.3d at 993 ("prior rulings in the proceeding, or another proceeding, solely because they were adverse" ordinarily will not suffice for disqualification under § 455(a)). If in ruling, however, the judge's comments "display a deep-seated favoritism or antagonism that would make fair judgment impossible," then grounds for disqualification may exist. *Liteky v. United States,* 510 U.S. at 555, 114 S.Ct. 1147; *see also United States v. Young,* 45 F.3d 1405, 1415 (10th Cir.), *cert. denied,* 515 U.S. 1169, 115 S.Ct. 2633, 132 L.Ed.2d 872 (1995).

■ In this case, the court addressed during the grand jury proceeding one of the issues now being raised at the suppression hearing. The court plainly explained in the prior order that its ruling was being made solely for purposes of the government's motion to compel and that it was based solely on two witness declarations

submitted by the government. The record also should reflect that the respondents in those grand jury proceedings did not contest the relevant facts as stated in those declarations. Consequently, the court did not conduct an evidentiary hearing and did not make any credibility determinations on the issue of abandonment. The circumstances of these proceedings and the prior ruling are such that no reasonable person would harbor doubts about this court's impartiality in deciding the defendants' suppression motion after a full evidentiary hearing. The court denies the motion to recuse.

## GOVERNMENT'S MOTION FOR DISCOVERY (Dk.45).

■ Before this case was transferred to this court, the government filed a motion pursuant to Fed.R.Crim.P. 16(b)(1)(A) requesting discovery of documents and objects from the defendant Frank Heck concerning his advice of counsel defense. The government's request stems from the defendant Heck's omnibus report in which he indicated his intention to raise this defense. The defendant responds that such matters remain privileged until he actually relies on the defense.

The court grants the government's motion insofar as the defendant Frank Heck is required to disclose no later than fourteen days before trial such documents and objects concerning this defense, if he intends to raise it at trial.

## GOVERNMENT'S MOTION TO ALLOW TWO CASE AGENTS TO BE EXCUSED FROM RULE 615 SEQUESTRATION (Dk.88).

The government asks to have Brian Holt, a Special Agent with HHS–OIG, designated as its representative under Rule 615(2) and to have FBI Special Agent LouAnn Stovall recognized as a second government representative under Rule 615(2), or alternatively, that Ms. Stovall be excused from sequestration under Rule 615(3) as essential to the presentation of the government's case. The defendants do not oppose the motion subject to the following conditions: (1) the government makes a sufficient showing that both agents are essential to the presentation of its case; and (2) the government does not oppose the defendants' use of support staff in a similar fashion to the presentation of their cases.

■ Rule 615 of the Federal Rules of Evidence directs that upon a party's request or upon its own motion "the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses" subject to certain exceptions which include the following ones relevant here: "(2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause." Citing Second and Fifth Circuit authorities, the government urges the court to allow more than one government agent to be designated as the government's representative. According to a leading treatise, this approach is not consistent with the policy behind Rule 615 and is not followed by a majority of the courts:

> Further, the policy underlying this second exception would be undermined by permitting a party that is not a natural person to appoint more than one representative at a time. As noted above, that policy is to avoid unfairness by giving a party that is not a natural person a right to avoid exclusion comparable to the right created by Rule 615(1) for a party that is a natural person. But permitting a party that is not a natural person to exempt multiple representatives from exclusion could be unfair

since a party that is a natural person can avoid exclusion under Rule 615(1) only for himself. While there is some authority suggesting that Rule 615(2) gives courts discretion to exempt from exclusion multiple representatives, the majority of courts that have considered the issue have decided to the contrary. 29 Charles A. Wright and Victor J. Gold, *Federal Practice and Procedure* § 6245 p. 80–81 (1997) (footnotes and citations omitted). The Tenth Circuit in an unpublished decision, *United States v. Williams,* 991 F.2d 806, 1993 WL 125403 (10th Cir. Apr.19, 1993), *cert. denied,* 510 U.S. 884, 114 S.Ct. 232, 126 L.Ed.2d 187 (1993), suggests it would follow the majority approach of allowing the government only one representative under Rule 615(2).

▪ The government, however, is not precluded from exempting additional witnesses from the exclusion order when those witnesses are needed to assist counsel:

> This is especially true in cases that involve complex and far-flung activities of large entities where no single agent or employee is familiar with all the relevant activities. Thus, where a party has exempted from exclusion one representative under Rule 615(2), additional witnesses "essential to the presentation of the party's cause" can be exempted under Rule 615(3). In fact, multiple witnesses may be exempt from exclusion on the grounds the presence of each is "essential."

*Federal Practice and Procedure, supra,* at § 6245 p. 82 (footnotes and citations omitted). Unlike Fed.R.Evid. 615(2), Rule 615(3) does not restrict the number of witnesses who may be deemed "essential to the presentation of [a] party's cause." *United States v. Phibbs,* 999 F.2d 1053, 1073 (6th Cir.1993), *cert. denied,* 510 U.S. 1119, 114 S.Ct. 1070, 127 L.Ed.2d 389

(1994). "A party seeking to exempt a witness from a sequestration order must show that the witness has such specialized expertise or intimate knowledge of the facts that the party could not effectively function in the witness's absence." *United States v. Klaphake,* 64 F.3d 435, 437 (8th Cir.1995) (citation omitted). "The 'essential' witness exception set out in Rule 615(3) 'contemplates such persons as an agent who handled the transaction being litigated or an expert needed to advise counsel in the management of the litigation.'" *United States v. Phibbs,* 999 F.2d at 1073 (quoting Advisory Committee Notes to Fed.R.Evid. 615).

▪ The parties agree this case is document-intensive and complex and the trial will involve numerous witnesses and exhibits. The government argues Agents Holt and Stovall are both needed to coordinate the travel and appearance of witnesses, manage the documentary evidence, assist in operating the computer equipment used in publishing evidence to jury, and advise on trial strategy. According to the government, Agent Stovall is intimately familiar with those areas where she would assist the government, and Agent Stovall's testimony will be limited to summary charts she prepared and will not overlap the testimony given by Agent Holt. Based on these representations, the court finds that the government has carried its burden of showing that Ms. Stovall fits the essential witness exception and that her presence during trial would not be unfairly prejudicial to the defendants. The government's motion is granted.

## GOVERNMENT'S MOTION TO SUPPLEMENT (Dk.127).

The government seeks to supplement its response to the defendants' motion to suppress. The government wants to add the declaration of Lawrence D. Greenbaum,

the attorney who represented the Invacare Corporation and Invacare Credit Corporation in the civil lawsuit filed against the defendants and their corporations. Though the government marked this declaration as an exhibit for the suppression hearing, it did have the declaration admitted as evidence. The defendants, however, never opposed this motion to supplement, so the court will grant the motion as uncontested.

## DEFENDANTS' JOINT MOTION IN LIMINE (Dk.94)

■ The defendants seek an order precluding the government from introducing any evidence of settlement documents relating to the civil litigation in which Invacare Corporation and Invacare Credit Corporation sued Midwest Healthcare Providers, Inc., HCL Enterprises, Inc., Frank Heck, Paige Heck, Troy Heck and Terence Cooper, for non-payment of credit extended for the purchase of durable medical equipment provided by Invacare. The defendants argue that Fed.R.Evid. 408 makes evidence of settlement negotiations inadmissible to prove liability for a claim or its amount. Alternatively, the defendants argue that any evidence concerning this civil litigation should be excluded under Fed.R.Evid. 403, because of the different evidentiary burdens in the two proceedings and significant likelihood of juror confusion. The government questions the applicability of Rule 408 to consent judgments like the one entered in this civil litigation when the defendants simply confessed owing Invacare the debt alleged in the civil complaint. Even if applicable, the government argues the civil consent judgment contains numerous admissions that can be offered and admitted for a proper purpose under Fed.R.Evid. 801(d)(2) and cites decisions from the Sixth and Seventh

Circuits in support of its position.[2] The government contends the defendants are unable to show how the probative value of these admissions is outweighed by any unfair prejudice or the likelihood of jury confusion.

■ In April of this year, the Tenth Circuit rejected the approach taken by the Second, Sixth and Seventh Circuits that applied Rule 408 only to civil proceedings. *United States v. Bailey*, 327 F.3d 1131, 1144–46 (10th Cir.2003). The circuit panel held that, "[a]lthough the question is a very close one, we agree with those courts which apply Rule 408 to bar settlement evidence in both criminal and civil proceedings." *Id.* at 1146. Thus, the panel found that the trial court erred under Rule 408 in allowing the government to introduce defendant's admissions found in the settlement agreement. *Id.* at 1144, 1146.

The government suggests the settlement here did not involve a disputed claim because the defendants consented to judgment. It appears from the records that the civil litigation progressed to the point of Invacare filing a summary judgment motion against the defendants, so the claim must have been disputed. The government also contends the defendants did not offer any valuable consideration, as they had nothing to offer. The settlement letter from the defendants' attorney in the civil litigation which the government attaches as an exhibit, however, does not sustain the government's argument. Rather, the letter shows the defendants were negotiating for a realistic "payback schedule." Nor does the letter show that Invacare would receive no valuable consideration from judgments against the defendants on their individual guaranties.

---

**2.** The government also cites *United States v. Ruedlinger*, 976 F.Supp. 976, 1005–006 (D.Kan.1997), which relied principally on Sixth Circuit precedent for its holding.

Of course, Rule 408 does not exclude evidence offered for some purpose other than proving "liability for or invalidity of the claim or its amount." The government argues it will offer this evidence for another purpose, that is, as admissions under Fed.R.Evid. 801(d)(2). The government cites no authority that recognizes an admission, regardless of its nature, to be "another purpose" under Rule 408. Indeed, this argument begs the question whether the admission is being offered for the prohibited purpose of proving the liability of the claim or its amount. "If, for example, the victim of criminal assault settles his civil claim with his assailant, and the latter is thereafter prosecuted for the crime of battery, he should be able to exclude the settlement (and related statements and conduct) from the criminal trial." 2 Christopher B. Mueller and Laird C. Kirkpatrick, *Federal Evidence* § 138 at p. 105 (2nd ed.1994). Nor does the Tenth Circuit's holding in *Bailey* support the government's sweeping exception for admissions. In analyzing whether it was plain error for the trial to introduce the evidence and admissions surrounding the civil settlement in the criminal case, the Tenth Circuit observed:

> Having concluded that it was error to admit evidence of the settlement, we must determine whether it was plain error, which requires a finding that the error affected substantial rights by "affect[ing] the outcome of the trial." *[United States v.] Haney,* 318 F.3d [1161] at 1166 [(10th Cir.2003)]. We conclude that it did not. There was ample other evidence establishing the substance of what Wilgers testified the settlement agreement contained—that Bailey had knowingly and intentionally taken money from the Partnership accounts and placed it in his own account, in contravention of the Partnership Agreement; that the partners did

not give him permission to do that; and that he had withdrawn in excess of $1 million without authorization from the partnership. Moreover, the testimony did not indicate that Bailey was "furnishing or offering or promising to furnish ... a valuable consideration" under Rule 408. It simply recounted Bailey's conduct in connection with the Partnership. While evidence that Bailey had admitted such conduct in the civil settlement added to the body of evidence before the jury about Bailey's conduct, it did not affect the outcome of the trial.

327 F.3d at 1146–47. The government does argue generally that the admissions are relevant in proving knowledge and intent, but it does not articulate with enough specificity for this court to conclude that the evidence is being properly offered for another purpose. Thus, the court grants the defendants' motion insofar as finding that Rule 408 applies here to the settlement and the defendants' admissions in the settlement, but the court reserves its ruling on whether the government may offer this evidence for another purpose and whether the evidence is admissible after the balancing the Rule 403 considerations. At trial, the government shall not refer to this evidence of the settlement before the jury until it has obtained the court's ruling the remaining issues.

## DEFENDANTS' JOINT MOTION TO DISMISS (Dk.95)

The defendants seek dismissal of the conspiracy charge in count one and the health care fraud charges in counts two through thirteen on various grounds. The government opposes the motion.

### Statute of Limitations on Count One Conspiracy

The defendants argue that count one alleges they defrauded Medicare, Medicare

beneficiaries and Invacare Corporation and includes as overt acts a listing of checks received from Medicare, many of which were received before August 14, 1997, or beyond the five-year limitations period. The defendants further contend that count one charges a conspiracy to commit health care fraud by submitting false claims or by billing for items not delivered but fails to allege when these claims or billings were submitted which "is when the alleged crime would have been committed." (Dk.95, p. 2). Alternatively, the defendants submit that if the court finds some overt acts to have occurred within the limitations period then it should strike as surplusage all allegations of acts occurring outside the limitations period.

■■■■ Under 18 U.S.C. § 3282, an indictment for a non-capital offense must be brought within five years "after such offense shall have been committed." For purposes of § 3282, an offense is "committed" when it is "completed ..., that is, when each element of that offense has occurred." *United States v. Yashar*, 166 F.3d 873, 875 (7th Cir.1999). There is an exception to this general rule for "continuing offenses." *Toussie v. United States*, 397 U.S. 112, 114, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970). Under the "continuing offense doctrine," if the offense is continuous, then the practical effect of its on-going nature is to extend the statute "beyond its stated term." *Id.* "Conspiracy ... is the prototypical continuing offense." *United States v. Jaynes*, 75 F.3d 1493, 1505 (10th Cir. 1996).

"It is well established that, where an overt act is required for a conspiracy, the statute of limitations on a continuing conspiracy does not begin to run until the last overt act in furtherance of the conspiracy is committed." *United States v. Jaynes*, 75 F.3d at 1505 (citations omitted); *see Fiswick v. United States*, 329 U.S. 211, 216, 67 S.Ct. 224, 91 L.Ed. 196 (1946) ("The overt acts averred and proved may thus mark the duration, as well as the scope of the conspiracy."); *United States v. Hauck*, 980 F.2d 611, 613 (10th Cir. 1992); *United States v. Thompson*, 125 F.Supp.2d 1297, 1302 (D.Kan.2000) ("To satisfy the statute of limitations as to the conspiracy count [18 U.S.C. § 371], an indictment must set forth at least one overt act that occurred within the statute of limitations period."), *aff'd*, 287 F.3d 1244 (10th Cir.2002); *cf. United States v. Stoner*, 139 F.3d 1343, 1344 (10th Cir.) (Tenth Circuit sitting *en banc* was evenly divided over whether § 371 indictment must allege for statute of limitations purposes "at least one specific overt act" within the five-year limitations period of 18 U.S.C. § 3282), *cert. denied*, 525 U.S. 961, 119 S.Ct. 403, 142 L.Ed.2d 327 (1998). "[T]he crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." *Grunewald v. United States*, 353 U.S. 391, 397, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). An "overt act[ ] ... [is] meaningful only if [it is] within the scope of the conspiratorial agreement." *Grunewald*, 353 U.S. at 414, 77 S.Ct. 963. "[A]n overt act may be made by 'only a single one of the conspirators and need not be itself a crime.'" *United States v. LaSpina*, 299 F.3d 165, 176 (2nd Cir.2002) (quoting *Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23 (1942)).

■■■ As the government correctly points out, count one charges numerous overt acts occurring within the limitations period, including the defendants' receipt of Medicare checks on their submitted false claims. *See United States v. Fletcher*, 928

F.2d 495, 500 (2d Cir.) (a "conspiratorial agreement that includes a payoff ... continues ... until the conspirators receive their anticipated profits."), *cert. denied*, 502 U.S. 815, 112 S.Ct. 67, 116 L.Ed.2d 41 (1991); *accord United States v. Knuckles*, 581 F.2d 305, 313 (2d Cir.) ("where a general objective of the conspirators is money, the conspiracy does not end, of necessity, before the spoils are divided among the miscreants"), *cert. denied*, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978). Count one further alleges a conspiracy to commit wire fraud and money laundering and includes specific allegations of overt acts committed in furtherance of the conspiracy after August 14, 1997. The court denies the defendants' request for an order dismissing count one as untimely or striking from the indictment those overt acts committed outside the limitations period.

### Statute of Limitations on Counts 2 Through 13

■ The defendants contend these counts are defective in not alleging the false claims were submitted after August 14, 1997, because the crimes would have been committed "when the defendants attempted to execute the scheme or plan alleged by submitting falsified documents." (Dk.95, p. 4). The defendants argue the government's delay in issuing the payment checks should not extend the limitations period. The government responds that the purpose behind the defendants' scheme was to make money and that the crime of health care fraud, like the other federal fraud statutes, is committed upon a defendant's receipt of funds.

Counts two through thirteen of the indictment charge the defendants with health care fraud in violation of 18 U.S.C. § 1347, which states in part:

Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

(1) to defraud any health care benefit program; or

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years or both.

These counts allege the defendants engaged in a scheme and artifice to defraud Medicare beneficiaries and the Medicare program in connection with the delivery and payment for wheelchairs and wheelchair cushions, "by submitting and causing to be submitted false claims to Medicare, that is, claims for upcoded wheelchairs and wheelchair cushions and claims for unnecessary cushions." (First Superseding Indictment, ¶ 40). In subsections to ¶ 40, the first superseding indictment specifically charges that the defendants provided Medicare beneficiaries with cheaper wheelchairs and/or wheelchair cushions but billed Medicare for the more expensive wheelchairs and/or cushions and that the defendants billed for cushions for wheelchairs with van seats when such cushions were unnecessary and unusable on the van seats. At ¶ 46, it charges that in executing the scheme and artifice the named defendants caused to be delivered to Midwest Health Care Provides, Inc., the entity through which the defendants were doing business, fraudulently obtained proceeds included in the checks issued by the four Durable Medical Equipment Regional Carriers ("DMERCs"), the contract entities which received, processed and paid claims submitted for Medicare reimbursement.

Each of the counts two through thirteen is based on a different reimbursement check issued by a DMERC between September 24, 1997, and March 9, 1998.

The health care fraud statute was modeled after the bank fraud statute, 18 U.S.C. § 1344, and the bank fraud statute was modeled after the federal mail and wire fraud statutes, *United States v. Anderson,* 188 F.3d 886, 888 (7th Cir.1999). Just as mail fraud is punishable once the material is placed in the mail, *see United States v. Barger,* 178 F.3d 844, 847 (7th Cir.1999), the crime of bank fraud is complete when the defendant places the bank at risk of financial loss, and not necessarily when the loss itself occurs. *Cf. United States v. Longfellow,* 43 F.3d 318, 324 (7th Cir.1994), *cert. denied,* 515 U.S. 1122, 115 S.Ct. 2277, 132 L.Ed.2d 281 (1995). Like the other fraud statutes, the bank fraud statute is meant to punish "each execution of a fraudulent scheme rather than each act in furtherance of such a scheme." *Id.* at 323 (quotation and citations omitted); *see United States v. De La Mata,* 266 F.3d 1275, 1287 (11th Cir.2001) ("The unit of the offense created by § 1344 is each execution or attempted execution of the scheme to defraud, not each act in furtherance thereof." (citations omitted)), *cert. denied,* 535 U.S. 989, 122 S.Ct. 1543, 152 L.Ed.2d 469 (2002). Thus, "a bank fraud offense is complete upon the 'execution,' or attempted execution of the scheme." *De La Mata,* 266 F.3d at 1287 (citation omitted). And, "the execution of the fraudulent scheme is complete upon the movement of money, funds, or other assets from the financial institution." *Id.* at 891 (citing *United States v. Christo,* 129 F.3d 578, 580 (11th Cir.1997)) (citing in turn *United States v. Mancuso,* 42 F.3d 836, 847 (4th Cir.1994)).

As stated above, the first superseding indictment here charges that the defendants attempted to execute and executed a scheme "to defraud Medicare beneficiaries and ... [Medicare] in connection with the delivery of and payment for health care benefits, items, and services." (First Superseding Indictment, ¶ 40). Thus, a defendant may be charged for each execution of the scheme to defraud, and the statute of limitations does not commence until the offense is complete, that is, when the fraudulently obtained proceeds were transferred to the defendants' control. Because counts two through thirteen charge the defendants with receipt of Medicare reimbursement checks during the limitations period, the court denies the defendants' motion to dismiss on this ground.

*Element of Knowledge for
Counts 2 Through 13*

*Element of Materiality for
Counts 2 Through 15*

The defendants argue the first superseding indictment is defective in alleging only that the defendants submitted false claims of payment and in not alleging that the defendants submitted claims for payment knowing the claims to be false. The defendants also argue that the first superseding indictment fails to include an allegation that the fraudulent conduct concerned material facts or representations. The government rejoins that the indictment sufficiently tracks the statutory language and that the specific allegations cover both elements of knowledge and materiality.

■ Rule 7(c) of the Federal Rules of Criminal Procedure requires that an indictment be merely a "plain, concise and definite written statement of the essential facts constituting the offense charged." An indictment is held only to minimal constitutional standards, and the sufficiency of an indictment is judged "by practical rather than technical considerations." *United States v. Dashney,* 117 F.3d 1197, 1205

(10th Cir.1997). "An indictment is sufficient 'if it contains the elements of the offense charged, putting the defendant on fair notice of the charge against which he must defend and if it enables a defendant to assert an acquittal or conviction in order to prevent being placed in jeopardy twice for the same offense.' " *United States v. Poole*, 929 F.2d 1476, 1479 (10th Cir.1991) (quoting *United States v. Staggs*, 881 F.2d 1527, 1530 (10th Cir.1989), *cert. denied*, 493 U.S. 1020, 110 S.Ct. 719, 107 L.Ed.2d 739 (1990)). " 'It is generally sufficient that an indictment set forth an offense in the words of the statute itself, as long as those words themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.' " *Tillman v. Cook*, 215 F.3d 1116, 1132 (10th Cir.) (quoting *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) (quotation omitted)), *cert. denied*, 531 U.S. 1055, 121 S.Ct. 664, 148 L.Ed.2d 566 (2000). " 'The test of the validity of an indictment is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards.' " *United States v. Gama–Bastidas*, 222 F.3d 779, 785 (10th Cir.2000) (quoting *United States v. Fitzgerald*, 89 F.3d 218, 222 (5th Cir.), *cert. denied*, 519 U.S. 987, 117 S.Ct. 446, 136 L.Ed.2d 342 (1996)). "Where a defendant challenges the sufficiency of an indictment for failure to state an offense, a court generally is bound by the factual allegations contained within the four corners of an indictment." *United States v. Welch*, 327 F.3d 1081, 1090 (10th Cir.2003) (citation omitted). "Courts, however, do not insist that any particular word or phrase be used in stating an essential element." *United States v. Kilpatrick*, 821 F.2d 1456, 1463 (10th Cir.1987) (citation omitted).

To obtain a conviction for health care fraud under 18 U.S.C. § 1347(2), the government must prove that the defendants knowingly and willfully executed or attempted to execute a scheme to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items or services by means of material, fraudulent representations. *Cf. United States v. Akers*, 215 F.3d 1089, 1101 (10th Cir.), *cert. denied*, 531 U.S. 1023, 121 S.Ct. 591, 148 L.Ed.2d 506 (2000). The Supreme Court has held that a materiality requirement is implicitly contained in those federal statutes that use the common-law term of "defraud," such as 18 U.S.C. §§ 1341, 1343, 1344 and 1347. *Neder v. United States*, 527 U.S. 1, 22–23, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999); *Carter v. United States*, 530 U.S. 255, 266, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000).

Because the different counts track the statutory language and set forth the elements of the health care fraud and wire fraud as established by the case law, the court concludes the indictment is sufficient. Concerning counts two through thirteen, the indictment sufficiently alleges that the defendants acted knowingly in submitting false claims for wheelchairs and wheelchair cushions and causing those fraudulently obtained proceeds to be delivered to Midwest Health Care Providers, Inc. "Whether the exact term used is 'knowledge' or 'devised' or 'agreed to conceal' is not relevant; '[t]here is no magic to the words used ... to allege guilty knowledge.' " *United States v. Kilpatrick*, 821 F.2d at 1463 (quoting *Davis v. United States*, 347 F.2d 378, 379 (10th Cir.1965)). Any additional specificity as to the knowledge element is an issue for the jury instructions, not the indictment.

Contrary to the defendants' interpretation, the Supreme Court in *Jones v. United States*, 526 U.S. 227, 119 S.Ct.

1215, 143 L.Ed.2d 311 (1999), did not develop any additional requirements for an indictment to allege the elements of the offense. Rather, the Court relied on the same rule stated sometime ago in *Hamling* and was more concerned with whether certain statutory language constituted an element of the offense or was a mere sentencing factor. This is not issue here. Nor must the indictment actually use the term, "material," in alleging this element:

> The failure to employ the word "material" in the language of the indictment, however, is not fatal. *See United States v. Richards,* 204 F.3d 177, 191 (5th Cir. 2000) ("In determining the sufficiency of the indictment, '[t]he law does not compel a ritual of words.'" (quoting *United States v. Wilson,* 884 F.2d 174, 179 (5th Cir.1989))). Instead, an allegation of fraud in an indictment will be sufficient so long as "the facts alleged in the indictment warrant an inference that the false statement is material." *United States v. McGough,* 510 F.2d 598, 602 (5th Cir.1975).

*United States v. Bieganowski,* 313 F.3d 264, 285 (5th Cir.2002), *cert. denied,* ___ U.S. ___, 123 S.Ct. 1956, 155 L.Ed.2d 851 (2003). It is enough if the indictment contains sufficient factual allegations to encompass the concept of materiality. *See, e.g., United States v. Fernandez,* 282 F.3d 500, 508 (7th Cir.), *cert. denied,* (537 U.S. 1028, 123 S.Ct. 580, 154 L.Ed.2d 442 (2002)); *United States v. Grey,* 56 F.3d 1219, 1223 (10th Cir.1995). As for each reimbursement check that is the basis of the counts two through thirteen, the first superseding indictment at ¶ 37(b) sets forth the amounts overpaid as a result of the false claims for wheelchairs and cushions. These factual allegations are sufficient to establish the concept of materiality to the false claims. In addition, counts 14 and 15 allege the necessary facts from which to infer the materiality of the false representations that are the subject of those counts.

*Multiplicity*

The defendants argue that counts two through thirteen are defective in not alleging any action or execution of the scheme to defraud on twelve separate occasions. The defendants emphasize that there is alleged but one victim with a series of transfers of money resulting from a single execution of the scheme to defraud. Relying on case law interpreting the bank fraud statute, the government insists the indictment appropriately charges twelve separate executions of the scheme to defraud.

█ An indictment is multiplicitous when "it charges a single offense in more than one count." *United States v. Haddock,* 956 F.2d 1534, 1546 (10th Cir.), *cert. denied,* 506 U.S. 828, 113 S.Ct. 88, 121 L.Ed.2d 50 (1992). Though not a fatal error for an indictment, multiplicity presents the danger of multiple sentences for one offense and the improper impression to the jury that the defendant committed more than one crime. *United States v. Morehead,* 959 F.2d 1489, 1504 (10th Cir. 1992). The defendants contend the government is charging each successive act of a single scheme to defraud a single victim as a separate crime under the same statute. On such a challenge, the court's analysis begins with identifying the unit of prosecution of the offense charged. *Sanabria v. United States,* 437 U.S. 54, 67 70, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978). "This inquiry as to what constitutes the correct unit of prosecution focuses in part on the identification of the key element of the federal offense." *United States v. Esch,* 832 F.2d 531, 541 (10th Cir.1987), *cert. denied,* 485 U.S. 908, 108 S.Ct. 1084, 99 L.Ed.2d 242 (1988).

Like the bank fraud statute at 18 U.S.C. § 1344, the health care fraud statute at § 1347 prohibits the execution of a scheme to defraud a particular victim or to obtain money from the victim by means of false representations or promises. In applying the bank fraud statute, the courts have held that "each separate execution of a scheme to defraud may be pled as a distinct count of the indictment." *United States v. Wall,* 37 F.3d 1443, 1446 (10th Cir.1994) (citations omitted); *see United States v. De La Mata,* 266 F.3d at 1287–89 ("each part of the scheme that creates a separate financial risk for the financial institution constitutes a separate execution").

The analysis next turns to whether a particular transaction is a separate execution of the scheme or a mere "component" of the scheme. *De La Mata,* 266 F.3d at 1288; *see Wall,* 37 F.3d at 1446. The court must ascertain the contours of the scheme and decide whether a jury "could plausibly find that the actions described in the disputed counts of the indictment, objectively viewed, constituted separate executions of the bank fraud scheme." *Wall,* 37 F.3d at 1446 (quotation omitted). Courts have identified factors relevant in this analysis: "the ultimate goal of the scheme, the nature of the scheme, the benefits intended, the interdependence of the acts, and the number of parties involved." *De La Mata,* 266 F.3d at 1288 (citations omitted). Targeting a single victim does not necessarily mean a single scheme was executed. *Wall,* 37 F.3d at 1446–47.

 The charged scheme here calls for submitting claims for equipment that was not provided or that was unnecessary and seeking and receiving payment from Medicare on those claims. Accordingly, each claim containing false representations and the corresponding receipt of payment on that claim was a separate and distinct execution of the same scheme, not an integrally-related act in furtherance of a single offense. There is nothing to suggest that the individual counts are based on nothing more than the defendants submitting again and again the same false claim on the same Medicare beneficiary. Indeed, each false claim appears to be separate from the other and to involve different beneficiaries. The payment on each claim involved a separate movement of money, and each movement resulted in a separate loss to the health care benefit program. *See United States v. Burger,* 964 F.2d 1065, 1074 (10th Cir.1992) ("[E]ach count of the Indictment involving a draw upon a line of credit would constitute a separate execution of the scheme and would be punishable as a separate crime."). With each count, the government must prove some different facts. As now charged and argued by the government, this is not a case of different counts being charged on a single impulse or on separate parts of a whole payment. *See United States v. Eaves,* 877 F.2d 943, 947 (11th Cir.1989), *cert. denied,* 493 U.S. 1077, 110 S.Ct. 1129, 107 L.Ed.2d 1035 (1990). " 'If successive impulses are separately given, even though all unite in swelling a common stream of action, separate indictments lie.' " *Blockburger v. United States,* 284 U.S. 299, 302, 52 S.Ct. 180, 76 L.Ed. 306 (1932) (quoting Wharton's Criminal Law, § 34). The court concludes there is no multiplicity in counts two through thirteen. The defendants' motion to dismiss is denied.

**DEFENDANTS' MOTION TO DETERMINE ADMISSIBILITY OF 801(D)(2)(E) EVIDENCE (Dk.96)**

The defendants ask the court to order the government's pretrial disclosure of all statements to be offered pursuant to Fed. R.Evid. 801(d)(2)(E), to conduct a pretrial *James* hearing to determine the admissi-

bility of these co-conspirator statements, and to establish an order of proof as to the conspiracy allegations. The government opposes an order requiring discovery of these statements but remarks that it "has, in large majority, already provided the defendants the information they seek" and that it would be impractical, if not impossible, for the government to list all possible co-conspirator statements. (Dk.115, p. 3). The government opposes a pretrial *James* hearing as lengthy and repetitive of trial and proposes the court follow its general practice of conditionally admitting the statements as the more expeditious procedure.

■ Under Rule 801(d)(2)(E) of the Federal Rules of Evidence, a statement is not hearsay if it is made by "a co-conspirator of a party during the course and in furtherance of the conspiracy." Before a co-conspirator's statement can be admitted pursuant to Rule 801(d)(2)(E), the trial court must determine by a preponderance of the evidence that: (1) that a conspiracy existed; (2) that the declarant and the defendant were both members of the conspiracy; and (3) that the statements were made in the course of and in furtherance of the conspiracy. *United States v. Sinclair*, 109 F.3d 1527, 1533 (10th Cir.1997). In deciding whether the prerequisites for admission of the co-conspirator's out-of-court statement have been satisfied, the court may consider the hearsay statement sought to be admitted in addition to the independent evidence presented. *Id.; United States v. Johnson*, 911 F.2d 1394, 1403 (10th Cir.1990), *cert. denied*, 498 U.S. 1050, 111 S.Ct. 761, 112 L.Ed.2d 781 (1991). " '[T]here need only be some independent evidence linking the defendant to the conspiracy.' " *United States v. Lopez–Gutierrez*, 83 F.3d 1235, 1242 (10th Cir. 1996) (quoting *United States v. Martinez*, 825 F.2d 1451, 1453 (10th Cir.1987)). To

be sufficient, the independent evidence need not be substantial, but it must be something other than the proffered statement. *Id.*

■ Under Tenth Circuit law, the district court may satisfy the prerequisites for admission of a co-conspirator statement through either of two means: by holding a *James* hearing or by provisionally admitting the statement "with the caveat that . . . the party offering [it] must prove the existence of the predicate conspiracy through trial testimony or other evidence." *United States v. Owens*, 70 F.3d 1118, 1123 (10th Cir.1995). Although it has a "strong preference for *James* proceedings where the government relies on co-conspirator statements," *United States v. Gonzalez–Montoya*, 161 F.3d 643, 649 (10th Cir. 1998), *cert. denied*, 526 U.S. 1033, 119 S.Ct. 1284, 143 L.Ed.2d 377 (1999), the Tenth Circuit permits a district court to provisionally admit the statement with the caveat that the offering party must prove the existence of the predicate conspiracy through trial testimony or other evidence. *Id.* Thus, a trial court may determine the admissibility requirements prior to or during trial in a *James* hearing outside of the presence of the jury, or it may provisionally admit the statement subject to proof at trial that connects up the statements to the predicate conspiracy elements. *United States v. Powell*, 982 F.2d 1422, 1432 (10th Cir.1992), *cert. denied*, 507 U.S. 946, 113 S.Ct. 1356, 122 L.Ed.2d 736 (1993); *United States v. Hernandez*, 829 F.2d 988, 994 (10th Cir.1987) ("[D]ue to intertwining nature of the non-hearsay testimony and the challenged statements," the court was justified in provisionally admitting the statements in lieu of following the preferred procedure), *cert. denied*, 485 U.S. 1013, 108 S.Ct. 1486, 99 L.Ed.2d 714 (1988).

A "defendant thus has no distinct right to a pretrial hearing with regard to the conspiracy determination." *United States v. Hernandez*, 829 F.2d at 994 (citing in part *United States v. Monaco*, 700 F.2d 577, 581 (10th Cir.1983) ("a trial court has no obligation to determine admissibility of possible hearsay at the pretrial stage.")). "At times, the court will be able to make its determination on the basis of proffers or even on the opening or what it knows of the available proof from the pretrial or suppression hearings." 1 Weinstein's Evidence ¶ 104[05] at 104–56 (1986). There is no abuse of discretion in denying a pretrial James hearings when the pretrial hearing would be lengthy and would entail calling and recalling officers and witnesses in an elaborate and repetitive procedure. *Hernandez*, 829 F.2d at 994.

When justified by the length, complexity and size of a conspiracy, as well as the number of co-conspirator statements involved, this court will wait until trial where it is in a better position to analyze the admissibility of specific co-conspirator statements. "'"[I]n certain instances where it is not 'reasonably practicable to require the showing to be made before admitting the evidence, the court may admit the statements subject to being connected up.'"'" *United States v. Cardall*, 885 F.2d 656, 669 (10th Cir.1989) (quoting *United States v. Petersen*, 611 F.2d 1313, 1330 (10th Cir.1979)) (quoting in turn *United States v. James*, 590 F.2d 575, 582 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), *cert. denied*, 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1980)). The decision to deviate from the preferred procedure resides within the trial court's sound discretionary judgment, but absent a substantial reason the preferred order of proof should be followed. *United States v. Troutman*, 814 F.2d 1428, 1448 (10th Cir.

1987). This exercise of discretion is often based "on the particular configuration of the government's evidence and the constraints of a multi-defendant trial." *United States v. Roberts*, 14 F.3d 502, 514 (10th Cir.1993). If it does not hold a James hearing, the district court must make, at least, preliminary factual findings on the record regarding the admissibility of the statements. *See United States v. Perez*, 989 F.2d 1574, 1580 (10th Cir.1993) (en banc).

Because this is a multi-defendant case involving a lengthy and complicated conspiracy and involving numerous co-conspirator statements, the court finds this procedure of preliminary findings in lieu of a *James* hearing on the condition that evidence at trial connects up the requirements. Accordingly, government's counsel shall file and serve a written proffer of its 801(d)(2)(E) evidence at least three weeks prior to trial. Such proffer shall include specific representative statement(s) from the different co-conspirators which the government will seek to have admitted pursuant to 801(d)(2)(E). The proffer also shall include a concise summary of evidence to be offered to establish the elements for admissibility, namely, that a conspiracy existed, that the declarant and the defendant were members of the conspiracy, and that the statements were made in the course of and in furtherance of the conspiracy. After receiving this proffer, the court will be in a better position to determine whether a *James* hearing is necessary to prove the existence of the predicate conspiracy. Even if no hearing is found necessary, the court may require the government during trial to present evidence by proffer or otherwise prior to receiving evidence containing co-conspirator statements.

As for the defendants' request for pretrial discovery of the government's evi-

dence to be offered pursuant to Rule 801(d)(2)(E), the defendants cite no convincing authority or precedent for such a request. This court has followed the rule in this district of not treating co-conspirator's statements as discoverable under Rule 16. *United States v. Johnson*, 1997 WL 447681, at *5 (D.Kan. Jun.9, 1997) (citing *United States v. Bennett*, 158 F.R.D. 482, 484 (D.Kan.1994)). Circuit courts have taken the same approach. *United States v. Williams–Davis*, 90 F.3d 490, 513 (D.C.Cir.1996) (and cases cited therein), *cert. denied*, 519 U.S. 1128, 117 S.Ct. 986, 136 L.Ed.2d 867 (1997). This discovery request is denied.

## DEFENDANTS' MOTIONS TO JOIN (Dk.93, 97, 109).

The court grants these motions.

## DEFENDANTS' DISCOVERY MOTION (Dk.99).

■ The defendants seek a court order that would require the government to permit the defendants to discover, inspect and copy a laundry list of items. The defendants submit a memorandum that generally supports their requests. The government opposes the motion saying it has provided not only all material to which the defendants are statutorily and constitutionally entitled but more discovery than required by those rules. The government asks the court to deny the defendants' request in that the government has either provided the requested information or is not required to provide the same.

The defendants do not refute the government's representation that it has provided all discovery to which the defendants are entitled by statute or case law. The defendants offer no persuasive authority or compelling circumstances that would justify additional discovery at this time. The court, however, strongly encourages counsel on both sides to discuss these requests in a meaningful fashion so as to satisfy any genuine concerns over outstanding discovery and to avoid unnecessary delays during trial. The court denies the defendants' discovery motion as moot in part by reason of the government's representation and as otherwise unsupported by persuasive authority.

## DEFENDANTS' MOTION TO PRESERVE INVESTIGATIVE OFFICERS' HANDWRITTEN NOTES (Dk.101).

The defendants seek an order directing the government to require all law enforcement officers investigating this case to retain and preserve their rough notes or field notes taken during this investigation, to take possession of those notes, to review them for *Brady* or Jencks Act material, and to preserve those notes during the pendency of this case. Defense counsel offer their personal experiences with officers' original, contemporaneous notes including matters not found in the officer's later formal report. The defendants point out that the *Brady* value of some notes may not arise until trial when a witness testifies inconsistently with information provided to officers as recorded in their notes. The defendants cite *United States v. Sullivan*, 919 F.2d 1403 (10th Cir.1990), as authority that an officer's handwritten notes from a witness interview may constitute *Brady* material. The defendants also observe that handwritten notes could qualify as Jencks Act statements if certain criteria are satisfied. The government argues that controlling precedent does not require officers to retain these interim notes, does not recognize such notes as statements under the Jencks Act, and does not require production unless shown to contain undisclosed *Brady* information.

■ The Tenth Circuit in *Sullivan* plainly recognizes the proposition that an officer's handwritten notes made during interviews of government witnesses and informants may be *Brady* material if exculpatory and material. 919 F.2d at 1426–

27.[3] It is also true that most courts, including the Tenth Circuit, have held that "rough interim notes of a government agent, when later incorporated in the agent's formal interview report, are not 'written statements' within the [Jencks] Act and need not be preserved." *United States v. Hinton*, 719 F.2d 711, 717 (4th Cir.1983) (discussed this as the holding of a majority of circuits, including the Tenth Circuit, and citing in part *United States v. Shovea*, 580 F.2d 1382, 1389–90 (10th Cir. 1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1216, 59 L.Ed.2d 456 (1979)), *cert. denied*, 465 U.S. 1032, 104 S.Ct. 1300, 79 L.Ed.2d 699 (1984). On the other hand, " '[i]nterview notes could be "statements" under the Act if they are substantially verbatim' recitals of a witness's oral statement and are recorded contemporaneously with the interview,' " *United States v. Jackson*, 850 F.Supp. 1481, 1508 (D.Kan.1994) (quoting *United States v. Smith*, 984 F.2d 1084, 1086 (10th Cir.)), *cert. denied*, 510 U.S. 873, 114 S.Ct. 204, 126 L.Ed.2d 161 (1993), or "if they contain a written statement signed, adopted or approved by the government witness," *Jackson*, 850 F.Supp. at 1508 (citation omitted). "Once the defendant makes a prima showing that a statement of the witness exists, the court cannot deny the defendant's request without a hearing or in camera review of the purported statement." *Jackson*, 850 F.Supp. at 1508 (citing *Smith*, 984 F.2d at 1086).

■ The court grants the defendants' motion and orders the government and the defendants to preserve the notes of any officers or investigators made during the interview of potential witnesses to this case. The court expects the government will abide by the law as set forth above regarding its obligation under *Brady* and search those notes of which there is a reasonable prospect or notice of finding exculpatory evidence. As for the disclosure of those notes pursuant to the Jencks Act, the defendants have not made the necessary showing for an *in camera* review nor requested the same.

## DEFENDANTS' MOTION FOR BILL OF PARTICULARS (Dk.106)

Count one of the first superseding indictment charges the defendants with con-

---

3. Of course, *Brady* requires the government to disclose only the material exculpatory evidence that is in its possession. "Possession" for *Brady* purposes is determined by several governing principles. "It is well settled that there is no 'affirmative duty upon the government to take action to discover information which it does not possess.' " *United States v. Tierney*, 947 F.2d 854, 864 (8th Cir.1991) (quoting *United States v. Beaver*, 524 F.2d 963, 966 (5th Cir.1975), *cert. denied*, 425 U.S. 905, 96 S.Ct. 1498, 47 L.Ed.2d 756 (1976)); *see United States v. Kraemer*, 810 F.2d 173, 178 (8th Cir.1987) (No requirement "to search out exculpatory evidence for the defendant"). At the same time, what the government possesses is not determined only from what the prosecution has in its file. "[A] prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case." *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir.1984). "If a federal prosecutor has knowledge of and access to exculpatory information as defined in *Brady* ..., then the prosecutor must disclose it to the defense." *United States v. Bryan*, 868 F.2d 1032, 1037 (9th Cir.), *cert denied*, 493 U.S. 858, 110 S.Ct. 167, 107 L.Ed.2d 124 (1989). A duty to search files maintained by governmental agencies closely aligned with the prosecution may be triggered when there is some reasonable prospect or notice of finding exculpatory evidence. *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C.Cir.1992). Mere possibilities or utter speculation will not give rise to this duty to search. *Id.* at 1503–04. "As the burden of the proposed examination rises, clearly the likelihood of a pay-off must also rise before the government can be put to the effort." *Id.* at 1504 (citation omitted). *See United States v. Hernandez*, 1999 WL 318090 at *7 (D.Kan.1999); *United States v. Jackson*, 850 F.Supp. 1481, 1502 (D.Kan. 1994).

spiracy to commit health care fraud, wire fraud and money laundering. This count alleges the named defendants conspired together and with "other persons, both known and unknown to the Grand Jury." The defendants seek an order requiring the government to disclose the "known" co-conspirators so alleged in count one. The defendants argue the identity of these other co-conspirators is an essential fact that due process requires the government to reveal and the government's theory of co-conspirators is information needed by the defendants to prepare a defense and to avoid surprise at trial. According to the defendants, a bill of particulars naming the known, but unidentified, co-conspirators would cure these deficiencies and is supported by Judge Lungstrum's decision in *United States v. Anderson*, 31 F.Supp.2d 933, 937 (D.Kan.1998).

The government responds that the identities of the known co-conspirators have been revealed to the defendants through the voluminous discovery already provided them. The government also believes the defendants are well aware of the government's theory to this case.

■■■ "The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense." *United States v. Ivy*, 83 F.3d 1266, 1281 (10th Cir.) (quotation omitted), *cert. denied*, 519 U.S. 901, 117 S.Ct. 253, 136 L.Ed.2d 180 (1996). It serves to minimize the defendant's surprise to the substantive facts of the charges, not the evidentiary basis of the charge. *See Wong Tai v. United States*, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545 (1927); *United States v. Hopkins*, 716 F.2d 739, 745 (10th Cir.1982). "Unless the request for the bill of particulars shows, on its face, that failure to grant the request would result in prejudicial surprise, the preclusion of an opportunity for

meaningful defense preparation, [or double jeopardy problems,] defendant has the burden of showing [by brief, affidavit or otherwise] that his or her request meets one of the three criteria." *United States v. Anderson*, 31 F.Supp.2d 933, 938 (D.Kan.1998), *reconsideration granted in part on other grounds*, 36 F.Supp.2d 1264 (D.Kan.1998). The district court has broad discretion in deciding a motion for bill of particulars. *United States v. Edmonson*, 962 F.2d 1535, 1541 (10th Cir.1992).

■■■ In exercising its discretion, the trial court must remain mindful of the parameters placed on a bill of particulars. Though it may provide more information, a bill of particulars is not intended to serve as a discovery device or to compel the government's disclosure of the factual proof planned for trial. *United States v. Dunn*, 841 F.2d 1026, 1029 (10th Cir.1988). A defendant is not entitled to notice of "all the evidence the government intends to produce, but only the theory of the government's case." *United States v. Levine*, 983 F.2d 165, 167 (10th Cir.1992). Nor is it a way to require the government's explanation of the legal theories expected at trial. *United States v. Gabriel*, 715 F.2d 1447, 1449 (10th Cir.1983). Evidentiary detail is not a proper request for a bill of particulars. *United States v. Barbieri*, 614 F.2d 715, 719 (10th Cir.1980). A bill of particulars is not required where the information necessary for one's defense can be obtained through some other satisfactory form. *See United States v. Canino*, 949 F.2d 928, 949 (7th Cir.1991), *cert. denied*, 504 U.S. 910, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992). Thus, a defendant's access to evidence is a factor to be considered. *See United States v. Kunzman*, 54 F.3d 1522, 1526 (10th Cir.1995).

■■■ The indictment sets forth the essential elements of the conspiracy offenses charged and provides the defen-

dants with minimal notice of the charges against which they must defend. It is not necessary for a conviction that a conspirator " 'know of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy [as long as he has] a general awareness of both the scope and the objective of the enterprise.' " *United States v. Eads*, 191 F.3d 1206, 1210 (10th Cir.1999) (quoting *United States v. Evans*, 970 F.2d 663, 669–70 (10th Cir. 1992), *cert. denied*, 507 U.S. 922, 113 S.Ct. 1288, 122 L.Ed.2d 680 (1993)), *cert. denied*, 530 U.S. 1231, 120 S.Ct. 2663, 147 L.Ed.2d 277 (2000). The government is not obligated to provide information on unindicted co-conspirators. *See United States v. Guebara*, 80 F.Supp.2d 1226, 1229 n. 3 (D.Kan. 1999); *United States v. Villota–Gomez*, 994 F.Supp. 1322, 1335 (D.Kan.1998); *but see United States v. Anderson*, 31 F.Supp.2d at 938. The court is satisfied that the indictment here meets the minimal due process standards. The indictment is not so vague or incomplete as to prejudice the defendants in anticipating and preparing their defenses or in later asserting double jeopardy protection. As represented by the government, the discovery furnished to the defendants already discloses the identities of all known co-conspirators. Thus, the defendants can obtain the requested information through another satisfactory form. Accordingly, the defendants have not met their burden of showing that the failure to grant their request for a bill of particulars would result in prejudicial surprise, would preclude an opportunity for meaningful defense preparation, or would cause double jeopardy problems. The motion for a bill of particulars is denied.

## DEFENDANTS' MOTION TO STRIKE SURPLUSAGE FROM THE INDICTMENT (Dk.107).

█ The defendants ask the court to strike from the indictment surplus lan-

guage that is objectionable as irrelevant and unfairly prejudicial. The defendants make the broad request to strike ¶¶ 1–19, 41–45, 47, 48, and 50–63, but they focus their arguments on ¶¶ 3a–3c and specifically to the allegations concerning the defendants' three prior medical supply businesses, two of which ended up in bankruptcy and the other which ended after its articles of incorporation were forfeited by the Secretary of State. The government posits that all of the indictment's allegations are relevant to the conspiracy and the scheme to defraud to be proved at trial.

Rule 7(d) of the Federal Rules of Criminal Procedure provides that on a defendant's motion the court "may strike surplusage from the indictment." As worded, the rule offers broad judicial discretion, but it has not been construed by the courts to favor the striking language. *United States v. Jackson*, 850 F.Supp. 1481, 1506 (D.Kan.1994). Thus, courts have not struck language unless it was both clearly irrelevant to the charges and inflammatory or prejudicial to the defendant. *See, e.g., United States v. Collins*, 920 F.2d 619, 631 (10th Cir.1990), *cert. denied*, 500 U.S. 920, 111 S.Ct. 2022, 114 L.Ed.2d 108 (1991); *United States v. Huppert*, 917 F.2d 507, 511 (11th Cir.1990); *United States v. Jackson*, 850 F.Supp. at 1506 (and cases cited there). "This is an exacting standard that is rarely met." *United States v. Jackson*, 850 F.Supp. at 1506 (citing *United States v. Hill*, 799 F.Supp. 86, 88 (D.Kan.1992)); *United States v. Eisenberg*, 773 F.Supp. 662, 700 (D.N.J.1991).

This standard has not been met here. Most of the paragraphs cited by the defendants are plainly and irrefutably relevant to the charges, and the court will not lengthen this order with a discussion of the obvious. As for ¶¶ 3a 3c, the question is

closer but not enough to warrant striking. The government explains the relevance of these allegations, as follows:

> The evidence will prove that the defendants hid their poor financial histories from Invacare to obtain credit, and used someone with good credit, Chad Bowen, to set up Midwest Health Care Providers as a Medicare durable medical equipment provider. Additionally, the defendants' prior companies conducted business with Medicare, which will help prove defendants' knowledge about Medicare, its rules, and its regulations. These businesses and their histories will therefore provide the background for the formation of Midwest Health Care Providers and will further provide explanations of why the defendants acted in the ways they did to further their criminal conspiracy and scheme to defraud.

(Dk.117, p. 4). Based on the arguments presented, the court does not find the allegations challenged here to be clearly irrelevant. The defendants' motion is denied.

## MOTION TO SUPPRESS (Dk.110).

The defendants seek to suppress any evidence or information obtained from the search of Midwest Health Care Providers, Inc.'s offices located at 36270 West 103rd Street, Clearview, Kansas, in May of 1999. They argue the search was warrantless and unjustified by exigent circumstances or consent.

### Facts

Chad Bowen originally owned Midwest Health Care Providers ("Midwest"), and the defendants later became its owners. The defendants served as Midwest's directors and officers, worked in its offices, and supervised Midwest's employees. In November of 1998, the defendant Paige Heck resigned as an officer and director of Midwest after submitting her letter of resignation.

Midwest maintained its offices at 36270 West 103rd Street, Clearview, Kansas, employing eight to twelve employees. Midwest was in the business of selling durable medical equipment, but very few customers came through its front door. Most of the office work done at this address was documenting and processing the sales and maintaining the records from those sales. Midwest purchased the equipment on credit from Invacare and gave Invacare a security interest in its assets, including its accounts receivable.

Midwest started leasing its business premises in June of 1996. James Leon Coker, a spry eighty-five-year-old commercial property owner, testified that he had leased Midwest one-half of his building on a month-to-month basis. Because Midwest had made improvements to the property, Mr. Coker discounted the rent to $400.00 per month and occasionally offered Midwest additional credit towards its rent. There was no written lease, and Mr. Coker dealt principally with Mr. Heck. The defendants did not present evidence of any agreement with Mr. Coker regarding the rights and responsibilities of the landlord and tenant in the event of non-payment of rent.

The defendants were able to enter Midwest's leased premises through any of the three doors and a garage door. The middle glass doors and an exterior side door shared the same key locks. The third entrance was a common interior access door that was unlocked and linked Midwest's space with the tenant occupying the adjacent space in the building. The tenants shared the one bathroom in the building. Midwest had organized its leased space with a large open area for shipping on the left and offices on the right with five or six individual offices. Midwest stored on its premises all of its business documents, as well as payroll information,

personnel files, tax records and attorney/client communications.

In October of 1998, Invacare sued Midwest and the defendants Terence Cooper, Frank Heck, Paige Heck and Troy Heck for failure to pay under a series of commercial purchase agreements, open accounts and personal guaranty agreements and prayed for a judgment in excess of two million dollars. In November of 1998, Medicare halted reimbursement payments to Midwest, Midwest stopped selling medical equipment, Midwest basically went out of business, and the defendants stopped going to work. On December 8, 1998, the district court handling Invacare's civil suit signed an agreed order that required the defendants to, *inter alia,* deliver all of Midwest's accounts receivable and all sums received from customers to Invacare; notify all of Midwest's customers, insurers and reimbursers of a change of address for remittance of payments as directed by Invacare; provide Midwest's billing records and computer billing systems to Invacare; and cooperate with Invacare to collect the accounts receivable and other amounts owing.

The defendant Cooper testified that in the latter part of 1998 "basically, the business [of Midwest] amounted to just collecting receivables, which were being turned over to Invacare." In December of 1998, the defendant Cooper met one day with a representative of an outside billing company working for Invacare and explained some of the documents and computer records and boxed up some files for use in the collection process. During his visit, Cooper observed the offices to be basically in the same shape as when he worked there

on a full-time basis. Around this same period, Cathy Hamrick still went to work on occasion to check the mail, process any checks, and cooperate with the collection efforts. Cooper said that Invacare, not Midwest, was paying Hamrick's salary.

At some point, Cooper learned that Hamrick had been locked out of the premises.[4]

He knew they owed several months of rent, but he had never made any arrangements or done anything else to shut down the business such as moving out equipment or files. At the hearing, there was evidence of Midwest making a rental payment on October 24, 1998, but the defendant Cooper could not recall paying any further rent after this date.

Mr. Coker testified that Midwest had not paid its rent so he checked on the premises and found no one there. It appeared to him that Midwest simply had left the lease. After determining that the middle glass doors were unlocked and that he did not have a key with him to lock it, Mr. Coker found a chain and lock to secure the doors and the building. He understood that the chain and lock would not prevent the defendants from using their keys to enter the side door or from using the common entrance shared with the other tenant. There also appeared to be a cat in Midwest's space that was not being cared for, so Mr. Coker took it to the athletic club where the defendants worked. Unable to find any of the defendants at the club, he stowed the cat in the "No. 10 tanning booth" and left quickly. Mr. Coker recalled going to the health club on three or four occasions to speak with the defendants about the situation and not

---

4. During the course of the civil litigation, Invacare requested certain documents from Midwest. At the deposition of Frank Heck on March 30, 1999, his counsel explained on the record that the defendants could not respond to the subpoena duces tecum as the records were in Midwest's old office which had been padlocked by its landlord who also had denied them access to the records.

finding any of them there. Mr. Coker admitted that he never told the defendants that they owed him back rent, that he had chained the middle door, or that he would be taking any action with regards to the property they had left behind.

Mr. Coker repeatedly testified that he believed Midwest and the defendants had abandoned their lease and had chosen simply to leave behind their various files, furniture and office equipment. At some point, an office equipment rental company contacted Mr. Coker about filing cabinets which Midwest had leased. Mr. Coker gave the rental company access to retrieve the file cabinets. Before removing the cabinets, the rental company employees emptied the files and documents from the cabinets. Mr. Coker did not take any further immediate action to remove all of the property that had been left behind. In part, he was hoping the defendants eventually would want the property back and would be willing to pay him some rent for having stored it.

The defendants never notified Mr. Coker that they were unable to pay the rent, that they still wanted him to store their property there, that he should not have their property removed, and that he should not give any third party access to their premises. The defendants offered no evidence that they made any effort to contact Mr. Coker soon after they quit working at the premises or even after learning that Mr. Coker had chained the front doors. They personally did not ask Mr. Coker for permission to retrieve the records and items left there and did not make alternative arrangements with him to have the records and items stored there for some period until they could pay some rent. In fact after December, the defendants apparently never went to the premises or tried to gain access through the other entrances that had not been chained

and padlocked. Mr. Coker testified that despite the chain on the middle doors the defendants could have entered the premises through the other door with the keys they retained and removed their property.

By letter dated January 14, 1999, counsel for Invacare notified the defendants' counsel in the civil suit about the following:

I have spoken recently with the landlord at the former premises of Midwest Health Care Providers, Inc. He has padlocked and chained closed the door to the facility. It is apparent that Midwest Health Care, Inc. will no longer be occupying the premises in the near future. Due to this urgency, I understand that Midwest Health Care Providers told Kathy Hambrick that all files containing documents pertaining to collections or reimbursements, whether Medicare or otherwise, may be sent immediately to Invacare Corporation/Invacare Credit Corporation's designee. . . .

Additionally, Medicare needs the person who signed Midwest Health Care Provider's original Medicare application to sign the change of address request. . . .

The beds, chairs, and equipment are to be moved on January 18, 1999 and will be resold thereafter by Invacare Corporation/Invacare Credit Corporation's designee. . . .

(Govt.Ex.7). Cooper was told by his attorney that Invacare would be paying the landlord some of the back rent in order to regain access to the premises and to finish their collection efforts.

Invacare's counsel wrote the defendants' attorney on May 6, 1999, saying he had sold equipment recovered from Midwest's premises and with the sale proceeds he had paid the landlord so as to gain access to the premises. The letter states that counsel saw Midwest's files on desks, the floor and perhaps in file cabinets. The letter also informs that Invacare's counsel

had retrieved certain files that included some of the defendants' checking account statements and records and that counsel was asking if the defendants wanted any of these records. Mr. Coker testified that he had allowed a representative from a Michigan company retrieve medical equipment that was said to belong to the company and the representative also removed some documents. Mr. Coker also testified that the company paid him two months of rent for the equipment that had been stored there.

In his testimony, Cooper expressed that because the landlord had chained the premises he believed Midwest's records were securely stored and would remain there until Invacare arranged for payment of back rent. Cooper denied having any intent to leave these records for trash. Rather, Cooper planned to arrange for storage of the records after Invacare was finished with them. Cooper said he never authorized Coker to have Midwest's records removed and never discussed with the landlord the consequences for non-payment of rent.

In May of 1999, Agent Holt telephoned Leon Coker and requested to speak with him at the former Midwest premises. When Mr. Coker arrived, he showed Agent Holt the premises. Believing that Midwest had abandoned its lease and the property and wanting the space emptied and available for leasing, Mr. Coker eagerly gave Agent Holt permission to search the premises and remove the documents. Prior to Agent Holt's offer, Mr. Coker had planned to discard the documents. For his own protection, Mr. Coker asked Agent Holt to prepare a letter saying that the agent had taken the documents. Agent Holt subsequently presented Mr. Coker with a Form OI-2 "Request for Information or Assistance" and over the span of two days he and another agent removed and loaded one hundred boxes of documents into a rental van. Mr. Coker testified that Agent Holt did not threaten or coerce him for permission to take the documents and that he was happy to have the documents removed as it helped him in cleaning up the premises for leasing to another tenant. As for the remaining documents that the agents did not remove, Mr. Coker had his daughter and grandchildren load them into a truck and discard them in a dumpster.

*Standing* [5]

■■■ Because Fourth Amendment rights are personal, a defendant may not assert his Fourth Amendment rights were violated as a result of " 'an illegal search and seizure of a third person's property or premises.' " *United States v. DeLuca,* 269 F.3d 1128, 1132 (10th Cir.2001) (quoting *United States v. Erwin,* 875 F.2d 268, 270 (10th Cir.1989)). " 'It is fundamental law that a person desiring to have evidence suppressed must first show he has standing to object to the search.' " *United States v. Cantley,* 130 F.3d 1371, 1377 (10th Cir.1997) (quoting *United States v. Deninno,* 29 F.3d 572, 576 (10th Cir.1994), *cert. denied,* 513 U.S. 1158, 115 S.Ct. 1117, 130 L.Ed.2d 1081 (1995)), *cert. denied,* 522 U.S. 1137, 118 S.Ct. 1098, 140 L.Ed.2d 153 (1998). The burden is with the defendant

**5.** The government first argues that the defendants in bringing this motion have the burden of identifying the specific documents which were seized in violation of their Fourth Amendment rights. Before an order suppressing documentary evidence could be effectively enforced at trial, the court plainly would need to know which documents to be introduced at trial were illegally obtained. The court declines the government's invitation to deny the suppression motion on this ground, as the government has so identified these documents in its response and any suppression order could be modified later so as to permit adequate enforcement of its terms.

" 'to show by a preponderance of the evidence that [he] was personally aggrieved by the alleged search and seizure because it invaded [his] subjective expectation of privacy which society is prepared to recognize as reasonable.' " *Cantley,* 130 F.3d at 1377 (quoting *United States v. Carr,* 939 F.2d 1442, 1444 (10th Cir.1991)). The well-established test used to determine standing relies on two factors: (1) " ' "whether the individual, by his conduct has exhibited an actual (subjective) expectation of privacy," ' " and (2) " ' "whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable." ' " *United States v. Jones,* 213 F.3d 1253, 1260 (10th Cir.2000) (quoting *United States v. Dodds,* 946 F.2d 726, 728 (10th Cir.1991) (quoting in turn *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979))).

The government argues the defendants are unable to show a subjective expectation of privacy that society could accept as reasonable considering that the defendants no longer occupied or controlled the commercial premises. The government further argues the defendants are unable to show a subjective expectation of privacy that society could accept as reasonable in corporate documents that were subject to regulatory review and that were voluntarily provided to third parties. The defendants cite *United States v. Leary,* 846 F.2d 592, 595–96 (10th Cir.1988), as authority for the general proposition that corporate officers or employees are able to assert a reasonable expectation of privacy in their corporate offices. The defendants point to their positions as officers of the corporation and to their work in compiling records, data and documents which they stored in their offices and desks. The defendants assert they "had reason and need to re-enter the premises, but could not due to the rent owed to the landlord." (Dk.111, p. 6). The defendants argue their

expectation of privacy should not dissipate with their inability to pay the rent. The defendants also argue an expectation of privacy based on the procedural process afforded under state law, including Kansas law on abandonment and cited provisions from the Residential Landlord Tenant Act, K.S.A. 58–2540 *et seq.* Finally, the defendant's maintain a privacy interest in closed containers—desk drawers, file cabinets and boxes—regardless of any asserted privacy interest in the premises.

 As the Supreme Court has explained, an individual's expectation of privacy in commercial premises is " 'different from, and indeed less than, a similar expectation in an individual's home.' " *Minnesota v. Carter,* 525 U.S. 83, 90, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (quoting *New York v. Burger,* 482 U.S. 691, 700, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987)); *see United States v. Gordon,* 168 F.3d 1222, 1226 (10th Cir.), *cert. denied,* 527 U.S. 1030, 119 S.Ct. 2384, 144 L.Ed.2d 786 (1999). A building's classification is not dispositive in deciding the level of privacy. *United States v. Bute,* 43 F.3d 531, 536 (10th Cir.1994). Rather, "the reasonable expectation of privacy in any given property turns on the particular nature and circumstances surrounding the place to be searched." *Id.* (citations omitted). Some relevant circumstances include if, when and where the public or third parties have been invited or otherwise have access to a building. *Id.* at 536–37.

 Courts have recognized that employees may have an objectively reasonable expectation of privacy in their workspaces or parts thereof. *United States v. Higgins,* 282 F.3d 1261, 1270 (10th Cir. 2002); *see O'Connor v. Ortega,* 480 U.S. 709, 715–19, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987). Employees' expectations of privacy in the workplace are decided on a case-

by-case basis. *See O'Connor v. Ortega,* 480 U.S. at 718, 107 S.Ct. 1492. Such expectations "may be reduced by virtue of actual office practices and procedures, or by legitimate regulation." *Id.* at 717, 107 S.Ct. 1492. The courts may consider additional factors including: " '(1) the employee's relationship to the item seized; (2) whether the item was in the immediate control of the employee when it was seized; and (3) whether the employee took actions to maintain his privacy in the item.' " *United States v. Angevine,* 281 F.3d 1130, 1134 (10th Cir.) (quoting (*United States v. Anderson,* 154 F.3d 1225, 1232 (10th Cir.1998)), *cert. denied,* 526 U.S. 1159, 119 S.Ct. 2048, 144 L.Ed.2d 215 (1999)), *cert. denied,* 537 U.S. 845, 123 S.Ct. 182, 154 L.Ed.2d 71 (2002). " 'Although ownership of the item[s] seized is not determinative, it is an important consideration in determining the existence and extent of a defendant's Fourth

Amendment interests.' " *Anderson,* 154 F.3d at 1231 (quoting *United States v. Erwin,* 875 F.2d 268, 270–71 (10th Cir. 1989)). The Supreme Court found a reasonable expectation of privacy in seized records where an employee [6] "had custody of the papers at the moment of their seizure." *Mancusi v. DeForte,* 392 U.S. 364, 369, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968).

■ Though property concepts are not necessarily determinative of Fourth Amendment rights,[7] they remain helpful in evaluating whether the asserted expectation is one that society is prepared to recognize as legitimate. *See Rakas v. Illinois,* 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Specifically, the lawfulness of occupancy is important in assessing whether an expectation of privacy is legitimate. *See United States v. McRae,* 156 F.3d 708, 711 (6th Cir.1998)

6. The same case-by-case analysis applies when the person allegedly aggrieved by a corporate search is an officer of the corporation. The Sixth Circuit in *United States v. Mohney,* 949 F.2d 1397, 1403–1404 (6th Cir. 1991), *cert. denied,* 504 U.S. 910, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992), discussed the relevant principles:

For example, in *Henzel v. United States,* 296 F.2d 650 (5th Cir.1961), the appellant could challenge the search because he was the organizer, sole shareholder, and president of the corporation, who prepared much of the material seized from his office, where he spent the greater part of every working day. Where the documents seized were normal corporate records not personally prepared by the defendant and not taken from his personal office, desk, or files, in a search that was not directed at him personally, the defendant cannot challenge a search as he would not have a reasonable expectation of privacy in such materials. *United States v. Britt,* 508 F.2d 1052, 1055 (5th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 40, 46 L.Ed.2d 42 (1975). *See also Williams v. Kunze,* 806 F.2d 594 (5th Cir.1986). Without a reasonable expectation of privacy in the seized materials, an officer may not challenge a search of the corporation:

When a man chooses to avail himself of the privilege of doing business as a corporation, even though he is its sole shareholder, he may not vicariously take on the privilege of the corporation under the Fourth Amendment; documents which he could have protected from seizure, if they had been his own, may be used against him, no matter how they were obtained from the corporation. Its wrongs are not his wrongs; its immunity is not his immunity.

*Lagow v. United States,* 159 F.2d 245, 246 (2d Cir.1946), *cert. denied,* 331 U.S. 858, 67 S.Ct. 1750, 91 L.Ed. 1865 (1947), quoted in *Britt,* 508 F.2d at 1055; *cf. United States v. Salvucci,* 448 U.S. 83, 91–93, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).

7. "[T]he focus of the Fourth Amendment inquiry is not on whether an individual has a property interest in the area searched, or whether the individual 'had abandoned his interest in the property-law sense' " at the time a search was conducted. *United States v. Potter,* 71 F.Supp.2d 543, 548 (E.D.Va. 1999) (quoting *California v. Rooney,* 483 U.S. 307, 320, 107 S.Ct. 2852, 97 L.Ed.2d 258 (1987) (J. White, dissenting)).

(defendant lacked a reasonable expectation of privacy in a vacant house that he did not own or rent); *United States v. Allen,* 106 F.3d 695, 698–99 (6th Cir.) (defendant lacked a legitimate expectation of privacy in a hotel room for which he had not paid the current rent), *cert. denied,* 520 U.S. 1281, 117 S.Ct. 2467, 138 L.Ed.2d 223 (1997); *United States v. Singleton,* 922 F.Supp. 1522, 1527–28 (D.Kan.1996) (hotel management regains control of room and may consent to search of room after the occupancy period expires without further payment of rent).

▮ Midwest's interest in the month-to-month lease terminated when it failed to pay the required rent for the next month and when it failed to make any alternative arrangements with the landlord for the late payment of rent or for maintaining lawful occupancy of the premises. By not removing its office equipment, files and other personal property, Midwest was holding over. By not having Mr. Coker's consent to hold over and by not paying any rent in recognition of a continued tenancy, Midwest became a tenant by sufferance.[8] Kansas law does not require that a landlord give notice to quit to a tenant by sufferance. K.S.A. 58–2509.[9] Thus, the defendants can assert no reasonable expectation of privacy arising from any expectation that Mr. Coker would provide them notice or from any understanding of Kansas law concerning the Residential Land-

lord Tenant Act. If anything, the defendants should have understood from Mr. Coker's immediate return of their cat and later chaining of the middle doors that Mr. Coker expected them to vacate the premises and that he would be taking measures to protect his interests in the commercial property.

At the time of the alleged constitutional violation, the defendants had not paid any rent on the month-to-month commercial building lease for at least six months.[10] The defendants walked away from their business and their leased offices without arranging for the return of leased office equipment and without regard for a pet that lived there. Other than leaving behind files and office equipment, the defendants did not actively occupy the premises or maintain the property left there. Indeed, there is no evidence that after December the defendants ever returned to the premises for the purpose of checking on the condition of their property. For more than four months prior to the search, the defendants had not entered the premises or even attempted to enter the premises. As Mr. Coker testified, the chain and lock on the middle doors did not prevent the defendants from using their keys to enter through the side door. The defendants never contacted nor requested from Mr. Coker that he give them access to the premises through the chained doors or that he permit them to remove their

8. A tenant by sufferance is one who wrongfully holds over after the termination of his interest and lacks lawful estate, title, or possession. Black's Law Dictionary (7th ed.1999).

9. The defendants are mistaken in their reliance on certain provisions from the Residential Landlord Tenant Act as the basis of their expectation of rights under Kansas law. The defendants' lease on behalf of Midwest was for commercial property, not a residential or dwelling unit.

10. This is not a case where the tenant was simply late in paying rent by several hours, days or weeks or where the landlord had acquiesced in the tenant not paying any rent for periods of several months or more. Nor is there any evidence of this being a case where the tenant had made a deposit which the landlord could apply towards several rental payments.

property. From December through May, the defendants never communicated with Mr. Coker nor authorized anyone to communicate on their behalf with him about their intentions or wishes with respect to the premises or the property left there. The defendants offer no proof that they expressed to Mr. Coker or any other interested party their intention to retain ownership of the business records and equipment from which they had walked away when they closed their business and stopped paying the rent. Finally, the defendants never sought any guarantees or assurances from Mr. Coker that he would protect the business records left behind or that he would refuse permission to third parties, including law enforcement officers, to handle, inspect or seize business records.

Beginning in December, the defendants essentially turned over what remained of their business, including its files and records, to Invacare and did not supervise or reserve any authority to supervise Invacare as to its access or use of Midwest's business files and records. At some point, Mr. Coker denied Invacare access to the premises to retrieve what Invacare represented was their medical equipment remaining on the premises, and Mr. Coker demanded that Invacare pay him some back rent for the storage of their equipment. The defendants did not protest Mr. Coker's actions and did not join Invacare's efforts to regain access to the leased premises. After being notified that Invacare had paid Mr. Coker some rent and regained access, the defendants point to no effort or attempt on their part to retrieve any records or equipment from the premises. The defendants' conduct conveys that they understood and intended for Invacare to take control over Midwest's business, including its documents and records, and that they cared nothing about the property. From December through May, the defendants never communicated with landlord authorizing or denying third parties access to the same.

The defendants did not come forth with proof that the law enforcement agents seized any of the defendants' personal records or documents, particularly any that were stored in closed containers. Nor have the defendants established that it would be reasonable for them as officers and shareholders to have an expectation of privacy in these corporate records and documents based on the manner in which they were prepared, maintained and stored at the time of the search. Moreover, any arguable expectation of privacy that could have been asserted in those corporate papers dissipated when the defendants turned over the papers to Invacare, acceded without objection to the landlord's control of third party (office equipment rental company and Invacare) access to the papers whether in closed containers or not, and took no precautions and attempted no other measures to assure the papers remained private and inaccessible to third parties who may have been permitted by the landlord to enter upon the premises in which the defendants had lost all legal interest. The court concludes that society is not prepared to accept this situation as conferring a reasonable expectation of privacy in corporate records and documents matters so carelessly regarded by the defendants. " '[A] search warrant is not required where a person has "so relinquished his interest in the property that he no longer has a reasonable expectation of privacy in it at the time of the search." ' " *United States v. Sampol*, 636 F.2d 621, 683 (D.C.Cir.1980) (quoting *United States v. Jackson*, 544 F.2d 407, 409 (9th Cir.1976)). Considering "all of the relevant circumstances," *Anderson*, 154 F.3d at 1232, the court holds that the defendants could not have an objectively reasonable expectation of privacy.

Even assuming the defendants had shown standing, the court would still conclude that Midwest's lease had terminated, that Mr. Coker was authorized to exercise control over the premises at the very least to mitigate his loss, and that based on the condition of the premises as well as Mr. Coker's actions, the officers relied in good faith on Mr. Coker's apparent, if not actual, authority to consent to a search of the premises. The testimony of Mr. Coker satisfies the court that he consented to the officers' search and seizure of the corporate records and that his consent was voluntary and without duress or coercion. The defendants' motion to suppress is denied.

## MOTION FOR *SIMMONS* IMMUNITY (Dk.140).

The defendant Cooper invokes his right to *Simmons* immunity and objects to the admission at trial of any statements he made at the suppression hearing unless the statements are offered for impeachment purposes in the event the defendant testifies at trial. The government does not object to the defendant Cooper's assertion of this immunity and the court recognizing the same. The court grants the defendant Cooper's motion.

IT IS THEREFORE ORDERED that the government's Motion for Discovery (Dk.45), Motion to Allow Two Case Agents to be Excused From Rule 615 Sequestration (Dk.88), and Motion to Supplement (Dk.127) are granted on the terms stated above;

IT IS FURTHER ORDERED that the defendant Frank D. Heck's Motion for Joinder (Dk.93), the defendant Paige A. Heck's Notice of Joinder in Co-defendants' Motions (Dks. 92 and 97), and defendant Terence W. Cooper's Motion for *Simmons* Immunity (Dk.140) are granted;

IT IS FURTHER ORDERED that the defendants' joint Motion in Limine (Dk.94),

is granted in part on the terms stated above;

IT IS FURTHER ORDERED that the defendants' following joint motions: Motion to Dismiss Indictment (Dk.95), Motion for Discovery (Dk.99), Motion for Bill of Particulars (Dk.106), Motion to Strike Surplusage From the Indictment (Dk.107), Motion to Suppress (Dk.110), and Motion for Recusal (Dk.130) are denied;

IT IS FURTHER ORDERED that the defendants' joint Motion to Determine Admissibility of Extra–Judicial Statements of Alleged Co–Conspirators (Dk.96) is denied on the conditions stated above which include the government providing a written proffer at least three weeks before trial;

IT IS FURTHER ORDERED that defendants' joint Motion to Require Preservation of Investigative Officers' Handwritten Notes (Dk.101) is granted on the terms stated above.